STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DOLLIE FAIR AND JOHN B. LYNN, DEFENDANTS-APPELLANTS.

Argued February 2, 1965—Decided June 14, 1965.

81

Mr. *John G. Graham*, Assistant Prosecutor, argued the cause for respondent (Mr. *Brendan T. Byrne*, County Prosecutor of Essex County, attorney, Mr. *Peter Murray* and Mr. *Philip R. Glucksman*, Assistant Prosecutors, of counsel and on the brief).

Mr. *George R. Sommer* argued the cause for appellant Dollie R. Fair.

Mr. *Gerald W. Conway* argued the cause for appellant John B. Lynn.

The opinion of the court was delivered by

HANEMAN, J. John B. Lynn (Lynn) and Dollie Fair (Fair) were charged in a single indictment with the murder of Aaron R. Rudesel. After a joint trial the jury returned a verdict of second degree murder against Lynn and manslaughter against Fair. Both defendants appeal their convictions to this Court as of right. *R. R.* 1:2–1(c).

The facts adduced at trial indicate that on September 2, 1962 the Newark police were summoned to the apartment of one William Knox at 316 Norfolk Street, Newark, where they found the body of Rudesel. The cause of Rudesel's death was a single stab wound in the chest, but he also suffered two superficial stab wounds in the neck, and cutting wounds on his left thigh and on the middle finger of his left hand.

Knox, the lessee of the apartment in which Rudesel was killed, testified that Fair had rented a room of his apartment from him, and that both Fair and Rudesel lived there together. In the forenoon of September 2, Rudesel left the apartment for a short time to purchase some whiskey. During his absence a man named "Jake" (later identified as the defendant Lynn) came to the apartment to see Rudesel and waited for him to return. Some time after Rudesel returned

Knox left Fair, "Jake" and Rudesel in the kitchen, and he went into the front bedroom and fell asleep. A short time later he was awakened by a crash in the kitchen. Upon investigating he discovered the kitchen table upset, dishes on the floor, and Rudesel sitting in a chair with blood on him. Just as he reached the kitchen he saw "Jake" go out the back door.

The above was basically the story that Knox told the police upon their arrival at the scene, and after they questioned him two police officers were detailed to apprehend a man by the name of "Jake." Their investigation led them to an apartment house at 291 Norfolk Street, where they ascertained that a man by that name lived in one of the apartment units on the third floor. The two officers were joined by three others. Three of these officers then proceeded to the third floor where there were at least three apartments. While one of the officers knocked on the door of one apartment another officer knocked on the door of a second. There was no response at either, but on hearing a noise in Lynn's apartment, they broke down the door; wherein they discovered Lynn, sitting in a chair, in front of a stove on which a chicken was cooking. Under a newspaper lying on the floor they discovered a bloody polo shirt. The undershirt he was wearing when the police arrived also had blood on it. After frisking Lynn, one of the officers stated to him that Rudesel was "in pretty bad shape," to which Lynn allegedly answered, "Yes, I know. I had a fight and I did it." Lynn was arrested and taken to police headquarters. The following day he gave a statement to the police, the gist of which was that he remembered going to the Knox apartment but became so intoxicated that he had no recollection of any fight with Rudesel.

The facts surrounding the actual stabbing are very unclear, caused at least in part by the alcoholic condition of the eyewitnesses thereto. The pertinent testimony of the key witnesses is as follows:

Emily Williams testified that on the morning of September 2 she and Fair had been visiting in the neighborhood, and

then went back to the Knox apartment. Lynn arrived shortly thereafter, followed by Rudesel. They were all sitting around the table in the kitchen when she suddenly saw Rudesel standing over Fair, and although she was not too clear, she thought that Rudesel had started an argument and a fight by hitting Fair. Fair picked up a paring knife from the table, went towards Rudesel and struck at him several times. She was unable to see whether Fair cut him with the knife because she was "scared and trying to get out." As Rudesel was reaching in his pocket for something, Lynn, who was at the other side of the table from Fair and Rudesel, picked up a knife and "came in and he got into it." At this point Lynn got between Fair and Rudesel and was "cutting at this man with a knife." After Lynn struck at him, Rudesel brushed past her and fell on the back porch. She ran down stairs out of the hallway door.

The defendant Lynn testified that he woke up about 4 A.M. on September 2 with a severe toothache. To alleviate his pain he started to drink gin, and by seven o'clock he had finished a pint. His brother-in-law came to his apartment about 7:30 with some vodka and he had several drinks of that. Lynn then went to a store to purchase food for the day and returned with a hen, which he proceeded to clean. Later that morning, on his way to the store to purchase additional food, he met Rudesel, who invited him to his apartment for a drink. Lynn accepted and accompanied him to the Knox apartment. Upon arrival there Rudesel asked Knox where Fair was. Upon learning that she had gone across the street Rudesel left to get her, leaving Lynn sitting at the table in the kitchen by himself. Lynn claims that his memory from that point on is a blank; he does not recall seeing Rudesel or Fair, or ever having met Emily Williams.

Dollie Fair testified that she and Rudesel had been sweethearts for about eight months prior to his death. On the night before Rudesel's death they had been to a tavern, and returned to the apartment at about 1:45 A.M. At about 8:00 or 8:30 Fair arose to fix Rudesel some breakfast. She then

went across the street to another apartment and had several drinks. Rudesel came to get her and they returned to the Knox apartment. When they got there Lynn was in the kitchen and Emily Williams arrived shortly thereafter. All four of them had some drinks from a pint of whiskey which Rudesel had furnished. As she and Emily Williams were eating, Rudesel commenced to berate her for having gone across the street, and suddenly hit her in the mouth. She grabbed a paring knife and struck at Rudesel, with her eyes closed. Rudesel grabbed her hands and pushed her down in a chair, accusing her of having cut him on the shoulder. Rudesel said, "I will get even with you for that"; took a knife out of his pocket and cut her on the finger. At this point Lynn jumped up and said, "Man, you shouldn't cut your woman like that." He then intervened on her behalf, and she ran out the back door and up the stairs to another apartment to call the police. Fair stated that she did not see Lynn cut Rudesel nor did she ever see a knife in his hand, but when she came back downstairs from making the telephone call she saw Knox who told her that "Aaron [Rudesel] said Jake stabbed him." (During her direct testimony she repeated this hearsay accusation of Knox on three occasions.) After learning of the stabbing she went to the home of her aunt. Later that day, at her aunt's suggestion, she surrendered herself to a detective, to whom she allegedly stated: "Aaron [Rudesel] hit me in the mouth and I may have cut him. I'm not sure. I didn't think I did, I had a knife." She later denied that she told the detective that she had stabbed Rudesel and denied that she did stab him.

I.

Lynn first argues that his arrest, effectuated by the police breaking into his apartment, without a prior oral demand for admission, was illegal and unconstitutional, and that the admission into evidence of the fruits thereof, *i.e.*, the bloody clothing and the oral statements he had made to the

police, was improper. Although defendant did not move to suppress in accordance with *R. R.* 3:2A–6(a), and indeed made no objection to the admission of this evidence at the trial, he contends that such damaging evidence had the clear capacity to bring about an unjust result and therefore constituted plain error. See *R. R.* 1:5–1(a); *State v. Williams*, 39 *N. J.* 471, 485 (1963), *cert.* denied 374 *U. S.* 855, 83 *S. Cl.* 1924, 10 *L. Ed. 2d* 1075 (1963). Although the issue is not before us because of Lynn's failure to comply with the mandate of the rule, we find the contention without merit.

When the validity of a search rests upon an arrest, the lawfulness of the arrest is to be determined by reference to State law insofar as it is not violative of the Federal Constitution. *Ker v. State of California*, 374 *U. S.* 23, 37, 83 *S. Ct.* 1623, 1632, 10 *L. Ed. 2d* 726, 739–741 (1963). The common law of arrest is extant in New Jersey. *State v. Mpetas*, 79 *N. J. Super.* 202, 207 (*App. Div.* 1963), citing *State v. (James) Smith*, 37 *N. J.* 481, 493–494 (1962). Ordinarily the common law requires that peace officers may break into a dwelling house for the purpose of making an arrest only after demanding admittance and explaining their purpose. *Cf. Ker v. California*, *supra*; *State v. (James) Smith*, *supra*, 37 *N. J.*, at *pp.* 497–500; *State v. Doyle*, 42 *N. J.* 334, 345 (1964). Compliance with the general mandate of such antecedent conduct is not required, however, where: (1) immediate action is required to preserve evidence, *State v. Doyle*, *supra*; (2) the officer's peril would be increased, *People v. Maddox*, 46 *Cal. 2d* 301, 294 *P. 2d* 6 (*Sup. Ct.* 1956), *cert.* denied 352 *U. S.* 858, 77 *S. Ct.* 81, 1 *L. Ed. 2d* 65 (1956); or (3) the arrest would be frustrated, *People v. Maddox*, *supra*.

Here, although the police officers knocked on Lynn's door they made no oral demand for admission nor any announcement of their identity or purpose. On the facts herein, however, it must be remembered that the arrest, effectuated by a forceable entry, occurred shortly after the commission of a vicious knife slaying; and that the police had obtained

information from Knox that the deceased had identified Lynn, whom Knox saw fleeing from the site of the crime, as the perpetrator of the homicide. Although there was no response to the officers' knock, they heard a noise in the apartment and as far as they knew Lynn was still armed with the murder weapon. Under these circumstances, failure to give notice was justified on the ground of all three exceptions, *i.e.*, the possibility that (1) Lynn would secrete the knife or destroy other evidence; (2) Lynn would escape through the rear of the apartment; or (3) the police officers would be imperiled by waiting for a response from an armed man who apparently had recently committed a murder. We find, therefore, that the mode of entry into the apartment for the purpose of arrest, under these circumstances, was lawful and the search conducted incidental to the arrest was equally lawful. It follows that the fruits of the search were legally obtained, as there can be no doubt as to the propriety of Lynn's arrest without a warrant.

## II.

During the State's affirmative case there were introduced two statements, one by Lynn and one by Fair. There was no objection by counsel for either defendant as to the voluntariness of either statement. However, counsel for Fair objected to the admission of Lynn's statement on the ground that it was hearsay as far as his client was concerned. In ruling on the objection the court stated:

"Insofar as the statement refers to others it is inadmissible particularly as to Dollie Fair and the jury shall not consider it. They can consider it only as to the defendant Lynn. * * *"

Lynn's counsel made a similar objection to the statement of Fair. The court then said:

"What is sauce for the goose is sauce for the gander. It is not admissible against Lynn, and the jury will be so instructed if it is admitted."

Both statements were read to the jury, prefaced by the judge's remarks that they were admitted "with the further instruction which the jury will receive later on that a statement made by one defendant is not binding on the other." No immediate direction to the jury was given, nor did the judge include a limiting instruction, as he suggested he would, in his charge. As a matter of fact, the judge charged, in relation to the defendants' statements, that they were admissible in evidence "* * * just like the verbal testimony you have heard in this case, the statement is eligible for your consideration in determining the guilt or innocence of the defendant."

Neither counsel objected to the above-quoted portion of the charge, but Lynn's present attorney asserts that the admission of Fair's statement without adequate and timely instructions to the jury constituted error and the failure to give proper limiting instructions in the charge constituted plain error.

In *State v. Tassiello*, 39 *N. J.* 282, 296–297 (1963), we stated:

"It is, of course, undisputed that Hayes' confessions were not admissible evidence of guilt against Hagan and Tassiello. Courts and commentators have recognized that the admission of one defendant's confession in a joint trial creates the possibility of prejudice to the other defendants if they are implicated by the confession. *Blumenthal v. United States*, 332 *U. S.* 539, 559–560, 68 *S. Ct.* 248, 257, 92 *L. Ed.* 154, 169 (1947) ; *Nash v. United States*, 54 *F. 2d* 1006, 1007 (2 *Cir.* 1932) ; Note, 72 *Harv. L. Rev.* 920, 989–990 (1959) ; Note, 56 *Colum. L. Rev.* 1112 (1956). Nevertheless, it is generally recognized that considerations arising out of the due administration of criminal justice frequently require that several defendants be tried jointly and that the confession of one defendant be admitted into evidence at such a joint trial where the circumstances are such that the jury can reasonably be expected to follow the court's admonition to disregard the confession as to the other defendants. *Delli Paoli v. United States*, 352 *U. S.* 232, 242, 77 *S. Ct.* 294, 300, 1 *L. Ed. 2d* 278, 285 (1957) ; *Blumenthal v. United States, supra*, 332 *U. S.* at 560, 68 *S. Ct.* at 257, 92 *L. Ed.*, at p. 169; *State v. Rios*, 17 *N. J.* 572, 585, 112 *A. 2d* 247 (1955) ; *People v. Roxborough*, 307 *Mich.* 575, 585, 12 *N. W. 2d* 466, 470 (*Sup. Ct.* 1943) ; *State v. Hall*, 55 *N. J. Super.* 441 (*App. Div.* 1959). The importance of the timeliness of such an admonition was emphasized in *Delli Paoli v. United States, supra*, where it was said:

'* * * These declarations [*i.e.*, those admissible only as to the declarant] must be carefully and clearly limited by the court *at the time of their admission* and the jury instructed as to such declarations and the limitations put upon them. Even then, in most instances of a conspiracy trial of several persons together, the application of the rule places a heavy burden upon the jurors to keep in mind the admission of certain declarations and to whom they have been restricted and in some instances for what specific purpose.' 352 *U. S.*, at *p.* 238, 77 *S. Ct.*, at *p.* 298, 1 *L. Ed. 2d*, at *p.* 283, quoting from *Lutwak v. United States*, 344 *U. S.* 604, 619, 73 *S. Ct.* 481, 490, 97 *L. Ed.* 593, 604 (1953). (Insertion the court's, but emphasis added.)"

Especial reference is here had to that portion of Fair's statement which reads as follows:

"Now after a few minutes at Mr. Murphy to call the police, I came back downstairs and Mr. Knox was at the rear porch door saying that he was woke up by a fight. He told me that Aaron was stabbed and laying out in front near the hall, and that *Aaron had told him that Jake [Lynn] had stabbed him.* When I heard this I continued down to front of house where I was when police came." (Emphasis added)

That the trial judge recognized the danger attendant upon such hearsay is evidenced by his warning to Knox when he was on the witness stand not to repeat his conversation with Rudesel before the latter died, and his warning to the prosecutor that the requisites for the admission of that statement as a dying declaration had not been met. Parenthetically, the State does not suggest that upon the record as here made this conversation was admissible as part of the *res gestae*. That question is not before us and we express no opinion thereon. See generally *State v. Driver*, 38 *N. J.* 255, 259 (1962).

██ The prejudicial impact upon the jury of Fair's hearsay repetition in the statement of what Knox allegedly told her about his conversation with Rudesel is self-evident, especially when it is recognized that this is the sole testimony directly accusative of either defendant with respect to the actual infliction of the wound. Not only was the failure to give timely limiting instructions to the jury after objection and upon introduction of Fair's statement error, but the impact was aggravated by the trial court's failure to treat of the limited

effect thereof in the charge. This, coupled with the charge as given, as to the reliance which could be placed on the confessions, had the clear capacity to bring about an unjust result and constituted plain error. *R. R.* 1:5–1(a); *State v. Williams, supra.*

In passing it should be noted that the objectionable portion of Fair's statement could well have been expunged without creating any confusion as to the meaning of the balance thereof. See *State v. Ravenell,* 43 *N. J.* 171, 183 (1964).

## III.

The trial court charged only on self-defense, *i.e.,* the right of each defendant to defend himself or herself, but did not charge on the right of Lynn to intervene in defense of Fair. Lynn argues that the trial judge had a duty to charge on his right to intervene in defense of Fair and that the failure to so charge, despite his then counsel's failure to request such a charge or to object to the charge as given, constituted plain error.

The trial judge has a mandatory duty to charge the jury on the fundamental principles of law which control the case, but whether, in the absence of objection, a failure to so charge constitutes plain error is dependent upon the circumstances of the particular case. *State v. Butler,* 27 *N. J.* 560, 594–595 (1958). For the reasons hereafter stated we find that the plain error rule has particular merit under the facts in this case based upon the necessity to charge the essential elements of "defense of another."

An essential element of the charge of murder is malice, *State v. Brown,* 22 *N. J.* 405, 411 (1956), and in order for criminal liability to attach there must be a concurrence of an "evil-meaning mind with an evil-doing hand." *State v. Williams,* 29 *N. J.* 27, 41 (1959). See also *State v. Labato,* 7 *N. J.* 137, 149 (1951). Basically, the so-called "affirmative defense" of defense of another in murder cases negates the existence of the essential element of malice. What

was said in *State v. Abbott*, 36 *N. J.* 63, 72 (1961), in connection with self-defense is equally applicable to defense of a third party:

"There has been some uncertainty in the language of our cases upon the burden of proof with respect to self-defense. The decisions are treated in *State v. Chiarello*, [69] *N. J. Super.* [479] (1961) where the Appellate Division correctly said that although the burden is upon a defendant to adduce evidence to support the defense, yet if such evidence appears either in the State's case or upon the defendant's case, the issue must be left to the jury with this instruction: that the burden is upon the State to prove beyond a reasonable doubt that the defense is untrue, and hence there must be an acquittal if there is a reasonable doubt as to whether defendant did act in self-defense within the definition of that defense. * * *"

So too is the relevant statute, *N. J. S.* 2A:113-6, applicable to both self-defense and defense of a third person. It provides:

"Any person who kills another by misadventure, or in his or her own defense, or in the defense of his or her husband, wife, parent, child, brother, sister, master, mistress or servant, or who kills any person attempting to commit arson, burglary, kidnapping, murder, rape, robbery or sodomy, is guiltless and shall be totally acquitted and discharged."

The right to use deadly force was not absolute at common law; the defender only had a privilege to use reasonable force to prevent the commission of the felony or to protect the member of his household who was endangered. *Perkins, Criminal Law* 881 (1957). The codification of those privileges did not change this result, as indicated by the judicial limitations which have been placed on the defense of self-defense, wherein it is settled that to give rise to the right of self-defense the defendant must act under a reasonable belief that he is in imminent danger of bodily harm, see *State v. Hipplewith*, 33 *N. J.* 300, 317 (1960); 1 *Wharton, Criminal Law and Procedure*, § 214, *pp.* 466–467 (1957); *Perkins, supra, pp.* 884–885, and the privilege is limited to the utilization of that amount of force which the defender reasonably believed necessary to overcome the risk of harm. *State v.*

*Abbott, supra,* 36 *N. J.,* at *p.* 68; *Perkins, supra, p.* 885. In the case of *State v. Bonofiglio,* 67 *N. J. L.* 239, 241–242 (*E. & A.* 1901), there is language indicative of the view that not only is there no duty to retreat when beset upon by a robber, but that the right to kill is absolute. We have no quarrel with the first part of the above statement, but to the extent that *Bonofiglio* says other than that the innocent victim of an attempted robbery may resort to deadly force if this reasonably seems necessary to frustrate the robber, it is herewith overruled.

There are, however, two approaches as to the scope of the right of one person to intervene in defense of another. One is that the fault of the defended party is imputed to the one who intervenes on his behalf, while the other is that the intervening party is bound only by his own intent. The former, commonly referred to as the *"alter ego"* rule, emphasizes that the right of one person to defend another is co-extensive with the right of the other to defend himself. The latter, categorized as the "objective test" theory, proceeds on the thesis that one who intervenes in a struggle under a reasonable but mistaken belief that he is protecting another who he assumes is being unlawfully assaulted is thereby exonerated from criminal liability. As stated by Bishop (1 *Bishop, Criminal Law,* § 303, *p.* 204 (*9th ed.* 1923)):

"What is absolute truth no man ordinarily knows. All act from what appears, not from what is. If persons were to delay their steps until made sure, beyond every possibility of mistake, that they were right, earthly affairs would cease to move. * * * All, therefore, must, and constantly do, perform what else they would not, through mistake of facts. * * *"

See generally 1 *Wharton, supra,* § 219; Comment, 20 *Wash. & Lee L. Rev.* 98 (1963); Comment, 64 *W. Va. L. Rev.* 342 (1962).

New Jersey has aligned itself with the latter view; the test of whether a party may intervene in defense of a third person being determined by the subjective intent of the intervener, subject only to the qualification that a jury

objectively find that he reasonably arrived at the conclusion that the apparent victim was in peril, and that the force he used was necessary. Thus, the so-called "reasonable mistake of fact" doctrine is given its due, both as to the amount of force and the initial lawfulness of the intervention, and precludes criminal liability even though it later appears that the person in whose behalf he intervened was in fact the aggressor or that no defensive measures on his part were actually necessary. *State v. Chiarello, supra*, 69 *N. J. Super.*, at *p*. 495; *State v. Lionetti*, 93 *N. J. L.* 24, 26 (*Sup. Ct.* 1919). Such a view has been recommended by the American Law Institute in its *Model Penal Code* § 3.05 (Tent. Draft No. 8, 1958). The test enunciated in the *Chiarello* case should, in theory, apply not only to non-fatal crimes committed in defense of a third person, as was the situation in that case, but as well to the killing of any person attempting to commit the felonies or attack the persons enumerated in *N. J. S.* 2A:113–6.

The defense is founded upon, and strengthened by, persuasive policy considerations. Not only is it just that one should not be convicted of a crime if he selflessly attempts to protect the victim of an apparently unjustified assault, but how else can we encourage bystanders to go to the aid of another who is being subjected to an assault? See *Model Penal Code* § 3.05, comment (Tent. Draft No. 8, 1958); Comment, *supra*, 20 *Wash. & Lee L. Rev.*, at *p*. 103; Comment, 12 *DePaul L. Rev.* 155, 156–157 (1962).

■ Applying these general principles to the facts herein, a jury may well have been justified in finding that Lynn became involved in the affray in order to defend Fair against what appeared to him to be the murderous onslaught of a drunken man wielding a knife. Whether such a mental state existed at all, and if so whether it was reasonably entertained, are necessarily jury questions which cannot be determined by this Court. In any event, this question was so essentially involved in the factual context of this case that the trial court's failure to charge the jury on that issue *sua sponte* was nothing less than plain error requiring a reversal.

## IV.

Fair argues that the following portion of the charge, to which an exception was taken, was erroneous:

"I charge you that if you do find not necessarily that these two did sit down and plot and plan, because I know of no such proof in this case, but there was a *unity of effort* where the intent could be formed at the very instant the act was done, and together where they both, if you do so find, committed an unlawful act, the consequences of which may be bloodshed, it is not necessary for the State to show who dealt the fatal blow, although it would be impossible to identify the person who actually used the sharp instrument. But—and I emphasize this—the State has to show that the unlawful act in which the defendants or others were engaged was one which would naturally and probably result in murder if the act were carried through." (Emphasis supplied)

The case was tried upon the alternative theories that one of the defendants caused the death of Rudesel without participation of the other and hence that only one was guilty, or that although the death was caused by a fatal blow delivered by one of the defendants, the other defendant participated in the affray and hence both were guilty as principals. *State v. Riley*, 28 *N. J.* 188, 196–197 (1958); *State v. Cooper*, 10 *N. J.* 532, 568 (1952). See *State v. (Clarence) Smith*, 32 *N. J.* 501, 522–523 (1960); *N. J. S.* 2A:85–14.

At common law all homicides are unlawful and amount to murder unless justified, excused, or alleviated. *State v. Brown, supra*, 22 *N. J.*, at *pp.* 410–411. Thus, if the jury determined that Rudesel died as a result of a single stab wound delivered by either defendant and that the killing was legally unjustified and inexcusable, the defendant inflicting the mortal blow would be presumptively guilty of second degree murder. *E.g., State v. King*, 37 *N. J.* 285, 293 (1962). From there, if the proper elements were present, the degree of guilt could be elevated to first degree murder, *e.g., State v. (Edgar) Smith*, 27 *N. J.* 433, 453 (1958), or alleviated to manslaughter, *e.g., State v. King, supra; State v. McAllister*, 41 *N. J.* 342, 353 (1964). At the same time, if the jury

found that the other defendant shared in the intent to commit the homicide and participated in the fray which caused that result, he could be found equally guilty of the homicide. *State v. Riley, supra,* 28 *N. J.,* at *pp.* 196–197.

■ To render both defendants guilty it is essential that they shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act. Mere presence at the scene of the crime, however, is insufficient to render a defendant guilty. See *State v. Loray,* 41 *N. J.* 131, 139 (1963); *State v. Ellrich,* 10 *N. J.* 146, 150–151 (1962); *State v. Fox,* 70 *N. J. L.* 353, 355 *(Sup. Ct.* 1904); 22 *C. J. S. Criminal Law* §§ 85, 87, *pp.* 250, 255 (1961); 1 *Wharton, Criminal Law and Procedure,* § 107 (1957).

■■ While each participant may be guilty "as a principal," *N. J. S.* 2A:85–14, he is not necessarily guilty in the same degree. If both parties enter into the commission of a crime with the same intent and purpose each is guilty to the same degree; but each may participate in the criminal act with a different intent. Each defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind. *E.g., Brown v. State,* 28 *Ga.* 199, 214 *(Sup. Ct.* 1859); *Mickey v. Commonwealth,* 72 *Ky.* 593, 596 *(Ct. App.* 1873); *Red v. State,* 39 *Tex. Cr. R.* 667, 47 *S. W.* 1003, 1004 *(Sup. Ct.* 1898); *Bingham v. Commonwealth,* 183 *Ky.* 688, 210 *S. W.* 459, 461 *(Ct. App.* 1919); *State v. King,* 198 *Iowa* 325, 197 *N. W.* 981, 986 *(Sup. Ct.* 1924); *Leavine v. State,* 109 *Fla.* 447, 147 *So.* 897, 904 *(Sup. Ct.* 1933); *State v. Shon,* 385 *P. 2d* 830, 843 *(Hawaii Sup. Ct.* 1963) (dissenting opinion); *cf. State v. Donato,* 106 *N. J. L.* 397, 406 *(E. & A.* 1929). See 1 *Warren on Homicide,* § 62, *pp.* 229–232 *(Perm. ed.* 1914); 4 *Warren, supra,* § 346, *p.* 480; 40 *C. J. S. Homicide* § 9b, *p.* 838 (1944).

■■ Under the facts here present, the jury should first have determined which defendant struck the fatal blow. Having thus identified the actual perpetrator of the homicide, the

jury should then have decided whether the other defendant shared in his intent to commit the act and joined in the commission thereof. In the event the jury found it impossible to determine which of the two actually delivered the fatal blow but were satisfied that it was one of the two, they should as well have determined whether both participated in concert in the affray with the intent to commit the act which resulted in the death, cf. *State v. Bavier*, 89 *N. J. L.* 214, 219 (*E. & A.* 1916). The jury could thus have found both not guilty, or, if they were satisfied that the essential elements of murder had been established beyond a reasonable doubt: (1) either defendant guilty and the other not guilty of murder, or (2) both defendants guilty of murder. Manslaughter being a killing which occurs during the heat of passion resulting from reasonable provocation, a passion which effectively deprives the killer of the mastery of his understanding and which is acted upon before a time sufficient to permit reason to resume its sway had passed, *State v. King, supra*, 37 *N. J.*, at *p.* 300; *State v. Guido*, 40 *N. J.* 191, 209–211 (1963), the jury could, under the facts here present, have returned additional verdicts—they could have found Fair guilty of manslaughter and Lynn either not guilty or guilty of murder. Under the proofs in this case it is inconceivable that Lynn could be found guilty of manslaughter because the facts do not justify a conclusion that he acted in a heat of passion.

While the verdicts in the instant case are not necessarily inconsistent, the charge as delivered was fatally deficient in failing to instruct the jury as to the essential elements of intent and participation discussed above, and as to the degrees of crime of which each defendant could be found guilty. The absence of such elucidation and use of the unexplained expression "unity of effort" had the clear capacity to mislead the jury and constituted plain error.

We have considered defendants' further alleged grounds of error and find them without merit.

Reversed and remanded for retrial consistent with *State v. Williams*, 30 *N. J.* 105, 116–119 (1959).

*For reversal* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For affirmance*—None.