126 N.J. Super. 565 (1974)
316 A.2d 12
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH DISSICINI, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1973.
Decided February 14, 1974.
*566 Before Judges HANDLER, MEANOR and KOLE.
Mr. Edward J. Dimon, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. William Welaj, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General, attorney).
The opinion of the court was delivered by MEANOR, J.A.D.
Defendant Joseph Dissicini, Jr. appeals from a conviction of murder in the second degree arising *567 out of the assassination of Glen Allen Renna, age 23, on January 7 or 8, 1971. The indictment charged defendant, Neil (Dutch) Hunterson, Theodore Pohlig, Howard Jay Stiles and David A. Bevilacqua with the murder and kidnapping of Renna. Defendant's case was severed and he was tried alone. He was acquitted of kidnapping.
The homicide did not come to light until August 17, 1971, when the body of Renna was exhumed from a grave near an abandoned house in a rural area of Berlin Township.
Defendant was a member of a motorcycle gang called the Henchmen. Their leader was Hunterson. Stiles and Pohlig were also members. The Henchmen used the old home near which Renna was buried as a clubhouse. Adjacent to the site of the clubhouse was property owned and occupied by Emanuel and Marie Magalotti. The Magalottis and members of the Henchmen became friendly and it was not unusual for members of the gang to congregate at their home.
During the evening of January 7 defendant and Pohlig ran across decedent at a bar. Renna expressed a desire to meet Hunterson. Renna was a member of a motorcycle gang called the Mongols, but was interested in joining the Henchmen. Renna followed defendant and Pohlig to the Magalotti home.
Shortly after the three entered, Pohlig called Magalotti aside and, referring to Renna, said that they were "going to put a hurt on this guy." Pohlig then called Hunterson, who arrived shortly with Stiles. The group sat and talked, except for Stiles, who may have been asleep, and several weapons, including a knife of Hunterson's and a gun possessed by Renna, were passed around or exhibited.
At about 10:30 P.M. Renna got up to leave and Hunterson then plunged his knife into Renna's abdomen. From this point forward all concerned obeyed Hunterson's orders. Renna, still alive, was bound and gagged. His pockets were emptied. Defendant participated in cleaning out Renna's car and wiping it of fingerprints. He aided Pohlig in carrying Renna to Pohlig's car and placing Renna in the trunk. Hunterson *568 called a Lenny Shrubs, president of another motorcycle gang named the Warlocks, and told Shrubs that he was bringing him a present. Hunterson and Pohlig left with Renna. With Mrs. Magalotti driving Renna's car, defendant accompanied her to Bristol, Pennsylvania where it was abandoned. They had followed Magalotti and Stiles, who occupied Magalotti's car. Upon return to the Magalotti home, defendant and Stiles fell asleep.
Hunterson and Pohlig arrived at the clubhouse with Renna, still alive, and Bevilacqua. At Pohlig's request the Magalottis went there to administer to Renna, who was in agony. There was talk about "putting him out of his misery." Mrs. Magalotti sutured the wound and attempted to ease his pain with an injection of xylocaine. Magalotti roused defendant and Stiles and had them return to the clubhouse. Defendant participated in completing a grave which had been started. He helped carry Renna to this site. Defendant testified that he was sure that Renna was dead at this point. The medical examiner could form no opinion on the topic. Renna (or his body) was dumped into the grave. Hunterson, with a gun in his hand, ordered the completion of his plan that everyone present would put a bullet into Renna, stating that all were in it together and if one were to hang all would. No doubt Hunterson was operating on the theory that such activity by his companions would be an interdiction against revelation of the evening's events.
By this time the Magalottis had returned to their home. A gun, apparently the weapon Renna had exhibited earlier, was passed from hand to hand. All fired into the grave. Defendant was the fourth of the five to shoot. He claimed that he deliberately fired into the side of the grave but not into Renna. According to defendant, Hunterson, Stiles, Pohlig and defendant each fired once and Bevilacqua twice. Three bullets were found in the body upon autopsy.
The Magalottis received several threatening notes over the next few months. Finally, on August 3, 1971 they went to the authorities. Pursuant to a grant of immunity that *569 they requested, their story was revealed and the exhumation of the body, arrests and the indictment soon followed. The Magalottis were the State's principal witnesses below. That they were testifying with immunity was made known to the jury.
Defendant claimed that he acted under duress. His thesis was that his fear of Hunterson was such, because he knew Hunterson would not hesitate to kill him for a breach of orders, that he obeyed his every instruction. Defendant excused his failure to exercise one of his many opportunities to escape and report to the authorities on account of this fear knowing that "Dutch" would find him. He points out, too, that Hunterson was continually armed and, during the final moments of the episode when turns were taken at firing into the grave, Hunterson's gun was visible in his hand.
The jury was charged on felony and non-felony murder, the felony being kidnapping. The jury was also instructed on duress, that defense being limited to the kidnapping, the court holding that duress as a defense is unavailable when the crime is murder.
We have been referred to no New Jersey case which permits the defense of duress to any crime, although State v. Palmieri, 93 N.J.L. 195 (E. & A. 1919), and State v. Churchill, 105 N.J.L. 123 (E. & A. 1928), note the issue. Generally, the defense is said to be available (with perhaps some isolated exceptions) to defense of all crimes except murder. 21 Am. Jur.2d, Criminal Law, § 100 at 180 (1965); Annotation, "Coercion, compulsion, or duress as defense to criminal prosecution," 40 A.L.R.2d 908 (1955); 1 Wharton's Criminal Law and Procedure, § 123 at 261 (1957). At common law there is virtual unanimity in the view that duress is not available as a defense to a charge of that crime. In addition to the above authorities see, e.g., Arp v. State, 97 Ala. 5, 12 So. 301 (Sup. Ct. 1893); R. v. Brown (1968) S.A.S.R. 467 (S. Australia Sup. Ct.); State v. St. Clair, 262 S.W.2d 25 (Mo. Sup. Ct 1953); Taylor v. State, 158 Miss. 505, 130 So. 502 (Sup. Ct. 1930). See also, People v. *570 Petro, 13 Cal. App.2d 245, 56 P.2d 984 (D. Ct. App. 1936), and State v. Moretti, 66 Wash. 537, 120 P. 102 (Sup. Ct. 1912), where there are discussions of statutes making the defense available except in cases of murder or where the crime carries the death penalty.
Defendant does not dispute the general rule, but argues that it is applicable only to a defendant who is the actual perpetrator of the killing, and that the defense should be available to one such as he who did not directly kill but only aided and abetted. Authoritative discussion of the point is sparse (but see R. v. Brown, supra, dissenting opinion; State v. Moretti and People v. Petro, both supra) and this is undoubtedly so because the argument has little merit.
Under the circumstances here defendant could not be convicted of second degree murder as an aider and abettor unless he participated with an intent that the victim be killed or be subjected to the infliction of grievous bodily harm. This was made quite clear to the jury by the charge of the trial court. State v. Fair, 45 N.J. 77, 94-95 (1965); State v. Madden, 61 N.J. 377, 396-397 (1972). Although our statute, N.J.S.A. 2A:85-14, requires punishment of each participant as a principal, this does not mean that all participants in a homicide are necessarily guilty in the same degree. As was said in State v. Fair, supra.
If both parties enter into the commission of a crime with the same intent and purpose each is guilty to the same degree; but each may participate in the criminal act with a different intent. Each defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind. [45 N.J. at 95]
Thus it is that participants in the same homicide may be variously found guilty of murder in the first degree, murder in the second degree or manslaughter. State v. Fair, supra, 45 N.J. at 94-96.
The rationale of the common law rule denying the defense of duress when the charge is murder is that one *571 cannot submit to coercion to take the life of an innocent person but should risk or sacrifice his own instead. Arp v. State, supra. The rule encompasses denial of the defense to all forms of murder, including homicides resulting from an intent to do grievous bodily harm as well as an actual intent to kill, and seems to include all other offenses where an intent to kill is an essential element. Watson v. State, 212 Miss. 788, 55 So.2d 441 (Sup. Ct. 1951). Since the second degree verdict was necessarily predicated upon a finding that the defendant participated with either an intent to kill or an intent that grievous bodily harm be done to Renna, the trial court was correct in precluding the defense of duress to the charge of murder.[*]
Defendant's contention that Pohlig's statement to Magalotti that they were "going to put a hurt" on Renna was inadmissible is refuted by reference to State v. Louf, 64 N.J. 172 (decided December 19, 1973); State v. Carbone, 10 N.J. 329, 338 (1952), and State v. Rios, 17 N.J. 572, 596 (1955). We also find without merit the contention that admission of (1) a photograph of Renna's body in the grave; (2) a bandage removed from the body after exhumation which had been placed over the wound by Mrs Magalotti, and (3) a photograph of skin removed from Renna's arm during autopsy which bore the tattoo of a serpent, were inflammatory *572 and prejudicial. The jury was properly instructed on this subject and there was no error. See State v. Thompson, 59 N.J. 396, 421 (1971).
Affirmed.
NOTES
[*] The verdict obviously exonerated defendant from the charge of participating in a felony murder. Had this been found, the verdict would have had to be one of guilt of murder in the first degree. Hence, the potentialities of the defense of duress to a felony murder charge is not now before us. Discussion of this precise issue is rare, but see State v. Moretti, People v. Petro and R. v. Brown, all supra, and People v. Pantano, 239 N.Y. 416, 146 N.E. 646 (Ct. App. 1925). Whether the defense is legally available to one who, under duress, aids and abets in the commission of a felony that results in a homicide, without an intention to kill or do grievous bodily harm and without knowledge of such an intent on the part of another participant, is a question we leave to another day.