**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0681-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RAMON VEGA,
a/k/a TONY RAMON,

    Defendant-Appellant.

_____

        Submitted January 11, 2022 – Decided January 19, 2022

        Before Judges Fisher and Currier.

        On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-10-2876.

        Joseph E. Krakora, Public Defender, attorney for appellant (Monique Moyse, Designated Counsel, on the briefs).

        Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a trial by jury, defendant was convicted of various controlled dangerous substances offenses based, in part, on police finding narcotics in defendant's residence while executing a knock-and-announce search warrant. At trial, the State also relied on surveillance video footage that showed numerous individuals entering and leaving defendant's property. Defendant appeals, arguing the judgment must be overturned because: the State's expert witness on narcotics distribution invaded the jury's province by conveying an opinion on defendant's state of mind; video footage was admitted into evidence in violation of N.J.R.E. 403 and 404(b); and the trial judge erred in denying defendant's motion to suppress evidence seized when officers failed to knock and announce their presence when executing a search warrant. Defendant also argues his sentence is excessive. We find no merit in these arguments and affirm.

On October 14, 2016, defendant Ramon Vega and co-defendant Adalberto Garcia, who is not part of this appeal, were indicted and charged with thirty offenses, including: conspiracy, narcotics possession and distribution, and weapons offenses. Prior to trial, the judge denied defendant's motion to suppress evidence seized pursuant to a search warrant. At the conclusion of an eight-day trial, the jury acquitted defendant and Garcia of four narcotics and weapons

charges but convicted them on the remaining still pending charges.[1] The judge

later denied defendant's post-trial motions, which raised issues not relevant to

the issues on appeal.

After appropriate mergers, the judge sentenced defendant to an extended

thirty-two-year prison term with a sixteen-year period of parole ineligibility on

his conviction of first-degree CDS possession with the intent to distribute,

N.J.S.A. 2C:35-5(a)(1) and -5(b)(1), and imposed lesser shorter prison terms on

the other unmerged convictions.

Defendant appeals, arguing:

> I. THE STATE'S DRUG DISTRIBUTION EXPERT
> IMPROPERLY INVADED THE PROVINCE OF THE
> JURY BY OPINING ON . . . DEFENDANT'S INTENT
> TO DISTRIBUTE DRUGS, CONTRARY TO STATE
> V. CAIN, 224 N.J. 410 (2016) (Not Raised Below).

---

[1] Specifically, defendant was convicted of: second-degree conspiracy, N.J.S.A. 2C:5-2; third-degree possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1); first-degree CDS possession with the intent to distribute, N.J.S.A. 2C:35-5(a)(1); four counts of third-degree CDS possession within 1000 feet of school property, N.J.S.A. 2C:35-7(a); four counts of second-degree CDS possession within 500 feet of public property, N.J.S.A. 2C:35-7.1(a); fourth-degree CDS possession, N.J.S.A. 2C:35-10(a)(3); second-degree CDS possession with the intent to distribute, N.J.S.A. 2C:35-5(a)(1); third-degree CDS possession, N.J.S.A. 2C:35-10(a)(3); second-degree CDS possession with intent to distribute, N.J.S.A. 2C:35-5(a)(1), -5(b)(2); third-degree CDS possession, N.J.S.A. 2C:35-5(a)(1), -5(b)(3); fourth-degree possession of drug paraphernalia, N.J.S.A. 2C:36-3; two counts of second-degree possession of a firearm during a prohibited crime, N.J.S.A. 2C:39-4.1(a); and third-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(b).

II. THE TRIAL COURT ERRED IN DENYING A MOTION FOR MISTRIAL WHEN THE STATE PORTRAYED [DEFENDANT] AS A BAD AND DANGEROUS PERSON BY PLAYING A VIDEOTAPE DEPICTING A YOUNG CHILD AROUND PITBULLS, WHICH THE STATE HAD PREVIOUSLY AGREED TO OMIT FROM EVIDENCE, AND WHICH CAUSED THE JURORS TO GASP AND SIGH.

III. THE TRIAL COURT ERRONEOUSLY ADMITTED AN EXCESSIVE AMOUNT OF PREJUDICIAL VIDEOTAPE EVIDENCE, VIOLATING N.J.R.E. 403 AND N.J.R.E. 404(b).

IV. THE TRIAL COURT ERRED IN DENYING A MOTION TO SUPPRESS BECAUSE OFFICERS UNREASONABLY FAILED TO KNOCK OR ANNOUNCE THEIR PRESENCE BEFORE BREAK-ING DOWN THE DOOR TO [DEFENDANT'S] HOME WHILE EXECUTING A KNOCK-AND-ANNOUNCE SEARCH WARRANT.

V. THE TRIAL COURT ABUSED ITS DISCRETION AND IMPOSED A MANIFESTLY EXCESSIVE SENTENCE.

We reject these arguments for the following reasons.

I

Defendant argues for the first time on appeal that Detective Rashaan Johnson, the State's drug distribution expert, improperly invaded the jury's province by conveying an opinion that defendant intended to distribute drugs

4

alleged to have been in his possession through the following testimony, to which defense counsel did not object:

> Q. I'm showing you what has been marked as S-50A. Can you please tell me what that is?
>
> A. These are pill bottles and inside the pill bottles and inside the plastic evidence bag, you have Oxycodone tablets.
>
> . . . .
>
> Q. Now, is the packaging of this consistent with the distribution of Oxycodone?
>
> . . . .
>
> A. I'm not sure because I don't know if this was used to test it at the lab.
>
> . . . .
>
> Q. Now I'm going to show you . . . what has been marked and entered into evidence as S-50-C. Detective, could you please tell me what that is?
>
> A. These are – it's an evidence bag with a clear zip lock bag with cocaine – zip lock bags of cocaine inside the sandwich bag.
>
> Q. Now, could you describe the packages that are inside that zip lock bag?
>
> A. Yes, these are small, what we call, clear baggies or transparent baggies and they come smaller than this and this might be the next size up.

A-0681-18

Q. Now in your experience, is that consistent with the packaging of cocaine for distribution?

A. Absolutely.

. . . .

Q. Now, I'm going to show you what has been marked and entered into evidence is S-50-E. Could you please tell me what that is?

A. Bags of marijuana. It's a sandwich bag or what we call commonly a sandwich bag, a clear storage bag and within it, it's individual bags of marijuana.

Q. Now those bags that you're holding, are those consistent with distribution for personal use?

A. Yes.

. . . .

Q. . . . I'm going to show you what has been labeled as S-51-A. . . . Detective, could you describe what you have in your hand?

A. This is the Dibutylone.

Q. And could you describe what the contents of the bag look like?

A. Zip lock bag with like rock-like substance.

Q. And based upon your experience and your research, is this consistent with packaging for distribution?

6

A. It's packaged but it can be broken down into smaller bags, depending on who is coming to purchase it. Like the zip lock bags or the sandwich-type bags, depending on how the individual wants to package it.

. . . .

Q. Now, I'm going to show you what has been entered into evidence already . . . . Can you please tell me what those are?

A. Those are pill bottles, commonly used, you know, you get them from the pharmacy. Those engaged in the distribution of pills or illegal narcotics, they might put the pills in here, . . . the labels are scratched off because those who sell pills can easily purchase pills from someone else. So they just take the label off and so on.

Q. I want to show you S-42-E. Is there a part of a label on that?

A. Yes.

Q. Does it say anything of particular note?

A. It says Oxycodone . . . .

Defendant additionally alludes to the prosecution's elicitation of Johnson's opinion on whether each type of the seized drugs was packaged for personal use or distribution, as well as his opinion on the price each drug would sell for. Defendant also complains of the prosecutor asking Johnson to weigh drugs using scales to explain the distribution process.

7

A-0681-18

Defendant contends this testimony usurped the jury's fact-finding function and "pronounc[ed] [defendant's] guilt." We disagree.

Law enforcement officers are permitted to testify as expert witnesses in drug cases because the "average juror is not knowledgeable about the arcana of drug-distribution schemes." State v. Cain, 224 N.J. 410, 426 (2016). Although our Supreme Court has stated that drug expert opinion is admissible to allow jurors to understand "the arcana of drug-distribution schemes," it has also cautioned that "an expert is no better qualified than a juror to determine the defendant's state of mind after the expert has given testimony on the peculiar characteristics of drug distribution that are beyond the juror's common understanding." State v. Covil, 240 N.J. 448, 466-67 (2020) (quoting Cain, 224 N.J. at 426-28). The Court further explained that

> [i]n drug cases, such ultimate-issue testimony may be viewed as an expert witness's quasi-pronouncement of guilt that intrudes on the exclusive domain of the jury as factfinder and may result in impermissible bolstering of fact witnesses. The prejudice and potential confusion caused by such testimony substantially outweighs any probative value it may possess.
>
> [Id. at 467 (quoting Cain, 224 N.J. at 427-28).]

Thus, the Court has declared that "an expert witness may not opine on the defendant's state of mind," and the question of whether a "defendant possessed

8

a controlled dangerous substance with the <u>intent</u> to distribute is an ultimate issue of fact to be decided by the jury." Cain, 224 N.J. at 429.

But what Cain prohibits is not what occurred here. The detective's testimony was proper because it was limited to the particulars of a drug distribution network and how the packaging of CDS would relate more to distribution rather than personal use. Detective Johnson did not testify that he believed defendant intended to distribute drugs, he only provided the jury with information about how drugs designated for distribution were usually packaged, weighed, and sold, which is not necessarily known to those outside of the drug-dealing world. By testifying how the evidence seized in this case compared to packaging for drugs usually intended to be sold, Detective Johnson relied on his own experience and expertise and provided helpful information to the jury. He did not usurp the jury's role as factfinder, as he did not testify about defendant's state of mind.

II

Defendant argues that the trial judge erred in denying his motion for a mistrial after the State played a video that showed a child in the vicinity of pit bulls in defendant's yard. We find no error or undue prejudice in the jury's unintended brief viewing of the portion in question.

9

The video was shown during the testimony of a police witness. After playing a portion showing various individuals coming and going, the video was fast-forwarded, and at a faster than normal speed revealed to the jury footage of individuals and a child in the yard with pit bulls nearby. Garcia's counsel moved for a mistrial, which defendant's counsel joined, arguing she heard an "audible gasp" from the jury. After replaying that portion of the video and hearing further argument from the parties – outside the jury's presence – the judge asked defendants if they would like a curative instruction about "the presence of a pit bull in proximity to the backyard." Garcia's counsel declined because it would just "relive that moment" and she did not think it could be cured. The response of defendant's attorney was similar.

The judge denied the motion and acceded to the defense request that no curative instruction be given. The judge also directed the prosecutor to "not make any comment about the proximity of pitbulls to children." Thereafter, the jury returned to the courtroom and the State continued to play the remaining video of the backyard showing defendants and other individuals entering and exiting the shed and backyard area.

"A mistrial should only be granted 'to prevent an obvious failure of justice.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151

10

N.J. 117, 205 (1997)). The decision rests with the trial judge's sound discretion and appellate courts will not disturb such a ruling "absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012).

Defendant argues that the portion of the video was prejudicial because it showed defendant's "bad acts" by depicting him as a "dangerous person of bad character . . . uncaringly causing danger to even innocent children." But defendant does not connect how the presence of pit bulls equates to a bad act or bad character. Moreover, the portion of the video showing a child near the pit bulls was seen at a faster than normal speed, and the record does not show, nor does defendant argue, that the State or its witness commented or highlighted the child being near the pit bull. Lastly, the judge expressed a willingness to provide an instruction to the jury to ameliorate any concern about this unintended event, and the defense declined. We find no abuse of discretion here.

III

Defendant also argues in his brief on the merits that the State presented an "excessive amount" of surveillance video during the days leading up to and partially including the day the search warrant was executed and that this footage showed "alleged bad acts, depict[ed] numerous people entering and leaving the shed, the defendants and pit bulls on the premises, and [defendant] counting and

hiding money in his apartment." Defendant contends that these videos were erroneously admitted in violation of N.J.R.E. 403 and N.J.R.E. 404(b), which defendant raised during his pretrial motions to suppress the videos. We disagree.

In ruling on defendants' in limine motion about these videos, the judge expressed his concern about the relevance of what was depicted earlier than a few days prior to the search. But the judge also correctly recognized, in conducting a N.J.R.E. 403 analysis, that the prosecution was entitled to show that what occurred there was not "just a one day thing," and was entitled to show "that the activity on the date that the search warrant was executed was consistent," while also recognizing that the videos from the day of the search and the day before "have the most logical relevance and would . . . not suffer from a claim of being cumulative."

Thus, the judge exercised his discretion in concluding that evidence of defendants in the backyard while other individuals were "coming in and out is . . . relevant to show access to the property, access to the shed, and the shed is where . . . a quantity of drugs was recovered." The judge reasoned that the "constant" presence of defendant and Garcia as opposed to any others revealed "their continued connection with the operation . . . with the shed."

12                                                    A-0681-18

The judge also found that videos that showed the interior of the basement apartment were admissible, explaining that "the conduct depicted within the home – the unscrewing of . . . a box-like substance, a counting of money, an unscrewing of the space heater, while it may . . . be suspicious . . . does not speak to the unduly prejudicial type of conduct that would be subject to exclusion under [N.J.R.E.] 403 balancing." The judge properly recognized that defendant's counting of money shown in the interior videos was related to

> possession with intent to distribute. That's the charge. [T]he State has the burden of proving that beyond a reasonable doubt. And, the distribution of drugs entails the exchange of a controlled dangerous substance for cash. Usually cash because it's not traceable.
>
> Therefore, the possession of cash in close proximity in both time and location to . . . where drugs were seized – and here it would be the shed which is up the stairs from the kitchen area – would be probative of drug distribution. That the possession of that money and the secretion of that money . . . whether it be a space heater or in some sort of electrical socket in a wall shows . . . not only the proceeds of drug distribution which the State seeks to prove, but also a recognition or consciousness of guilt that the defendant chooses to hide that in the wall or a space heater.

The judge acknowledged the alternative possibility that defendant could have been afraid of being robbed and that was why he was concealing the money, but he also recognized that "an inference could be that . . . it was there to conceal

13

the proceeds of drug trafficking from potentially the execution of a search warrant." Because the interior videos showed defendant counting the money and using the tool to open and close the container, the judge found it was "logically relevant" and "not inherently prejudicial."

The judge also addressed whether the video evidence should be considered under an N.J.R.E. 404(b) analysis or if the footage was intrinsic to the charged crimes. He concluded that "[b]ased upon the close proximity in time and place," the proper analysis was not under N.J.R.E. 404(b), because the evidence was "proof of the crime charged." As a result, the judge found the videos were intrinsic evidence and that the N.J.R.E. 403 balancing test was satisfied.

But the judge also found in the alternative that the video footage was admissible under the N.J.R.E. 404(b) analysis set forth in State v. Cofield, 127 N.J. 328, 338 (1992). The judge first found that the "movement of persons in the backyard" and their movement "close in time to the seizure of the drugs" was relevant "to the purpose for which the drugs were possessed." The judge also found that the videos fulfilled the second factor of the Cofield test because he had limited the admission of the surveillance video to only footage taken on the day of the search and the two prior days. He found the videos fulfilled the third factor – that the evidence be clear and convincing – because the actions were

"memorialized on surveillance tape that was maintained at the premises." And he found that its probative value was not outweighed by its apparent prejudice because the videos were "highly relevant to effect elements that the State must prove beyond a reasonable doubt," and that "any potentially prejudicial impact could be adequately addressed by a curative instruction."

We affirm the judge's rulings regarding the admission of the video evidence substantially for the reasons he gave. We agree that the evidence was intrinsic to the crimes charged but, even if not, it was admissible under N.J.R.E. 404(b), as explained by the judge.

IV

Defendant argues that the trial court erred in denying his motion to suppress because of the manner in which the warrant was executed.

At the pretrial hearing, Detective Yousef Ellis testified that he executed search warrants associated with defendant and Garcia in January 2016, as well as the search warrant in this matter. On August 23, 2016, Detective Ellis and the rest of the search team were supposed to execute a search warrant for the "rear basement" apartment and the third-floor apartment located at 246 Clifton Avenue in Newark. Detective Ellis's role was "breacher," that is, he was to gain entry to the dwelling using a ram. He testified that the officers confused the two

A-0681-18

neighboring buildings, and first knocked and announced at the door of 244 Clifton Avenue before breaching the door into a common-area hallway at that address.

Once inside 244 Clifton, an officer yelled it was the wrong door and immediately exited. Detective Anthony Docke then breached the door of 246 Clifton Avenue into a common hallway, and Detective Ellis went up the staircase to the upstairs apartment door. He noticed there was a padlock on the door of the upstairs apartment, and he knocked and announced his presence, waited a "few seconds," and then breached the door using the ram. Once inside the apartment, Detective Ellis saw a "[l]arge amount of narcotics, cocaine, heroin, marijuana, ballistic vests, [and] weapons."

Detective Docke also testified at the evidentiary hearing and stated that he had been at the 246 Clifton property to execute a different search warrant in January 2016. He explained that his experience with this earlier search warrant "was probably like one of the worst search warrants [he had] been on"; it involved pit bulls, drugs, and guns, and "a couple guys got into a fight." He recalled there were three pit bulls that were "pretty big dogs," and two of the dogs began fighting after one broke his chain. One of the officers had to fire his

16

weapon at one of the dogs because one of the men at the property said, "once he gets finished with this dog he's coming after you all."

Detective Docke testified that after they realized Detective Ellis went to the wrong door in executing the warrant in question, he remembered how he had "been at this property before and [knew] these guys in here," that "they're kind of bad dudes," and that police "never have a good experience when [they] have to do a search warrant or go to this property." Detective Docke explained that he knew they had to "get to the right house because if these guys [were] in here we don't know what they'll be doing on the other side of the door," and so he went to the correct door and kicked it open without knocking and announcing.

Detective Docke further explained that he did not knock and announce at 246 Clifton's exterior door because he "was a little nervous"; he "heard some kind of commotion and everything," and he wanted to make sure that if the men were in the building, that the officers rather than the occupants would have the advantage. He testified that when executing a search warrant, it is important to have time and the element of surprise on their side. In the instance in question, Detective Docke claimed he heard "some kind of ruckus or something going on" inside the building, which was why he kicked in the door without knocking and announcing.

17

In denying the motion to suppress, the judge relied on the credibility of Detectives Ellis and Docke in recognizing the presence of the exception to the knock-and-announce requirement because of the peril facing the officers. The judge found significant Detective Docke's testimony about his prior experience executing a search warrant at 246 Clifton, that "time is either . . . your enemy or your friend," and that "[b]y breaching the wrong door" the officers "were losing time." In addition, the search warrant was directed toward "drugs and firearms," and that "[f]irearms are inherently dangerous."

A knock-and-announce provision in a warrant "renders unlawful a forcible entry to arrest or search 'where the officer failed first to state his authority and purpose for demanding admission.'" State v. Rockford, 213 N.J. 424, 441 (2013) (quoting State v. Robinson, 200 N.J. 1, 13-14 (2009)). If announcement of their presence is "greeted with silence, . . . a reasonable time must elapse between the announcement and the officers' forced entry." Id. at 450 (quoting State v. Johnson, 168 N.J. 608, 621 (2001)).

This rule's purpose is threefold: "(1) to reduce the risk of violence to police and bystanders; (2) to protect the privacy of uninvolved residences by minimizing the risk that police will enter the wrong premises; and (3) to prevent property damage stemming from forcible entry." Id. at 442. The rule "has never

protected . . . one's interest in preventing the government from seeing or taking evidence described in a warrant." Ibid. (quoting Hudson v. Michigan, 547 U.S. 586, 594 (2006)). Rather, it "affords residents the 'opportunity to prepare themselves' for the entry of police." Ibid. (quoting Richards v. Wisconsin, 520 U.S. 385, 393 n.5 (1997)).

Although we adhere to our prior holdings that the exclusionary rule applies when police violate our state constitution's prohibition of unreasonable searches and seizures by failing to knock and announce when directed by the warrant, State v. Caronna, __ N.J. Super. __, __ (App. Div. 2021) (slip op. at 36); State v. Rodriguez, 399 N.J. Super. 192, 205 (App. Div. 2008), we also recognize that "[e]ven when the knock-and-announce rule governs, it is not absolute." Rockford, 213 N.J. at 442 n.1. Our Supreme Court has carved out exceptions to this rule when: "(1) immediate action is required to preserve evidence; (2) the officer's peril would be increased; or (3) the arrest [or seizure] would be frustrated." Ibid. (alteration in original) (quoting State v. Fair, 45 N.J. 77, 86 (1965)). The Court has "recognized the importance of protecting officer safety . . ., particularly when the subject of the investigation has access to weapons, [it] is an important concern in the reasonableness determination." Id. at 443 (citing Terry v. Ohio, 392 U.S. 1, 24 (1968); State v. Davila, 203 N.J. 97,

19

115 (2010); State v. Dunlap, 185 N.J. 543, 551 (2006); State v. Roach, 172 N.J. 19, 2 (2002)). This balancing between "individual rights and law enforcement safety is best accomplished by a case-specific analysis." Ibid.

Defendant provides no principled reason for our rejection of the judge's finding that officer safety justified the departure here from the knock-and-announce requirement. The judge relied on Detective Docke's testimony of a concern that the mistaken breach of the building next door caused a commotion that could have alerted the occupants of 246 Clifton. Detective Docke also testified about his prior experience executing a search warrant at 246 Clifton eight months earlier, describing it as one of "the worst" search warrant executions he had experienced. He recalled the resistance the occupants of 246 Clifton gave officers during that prior execution, as well as the multiple pit bulls on property, one of which an officer had to shoot to "neutralize," and that a gun had been recovered during that search.

The record fully supports the judge's finding that the officers' safety was at risk and justified the failure to knock and announce at the door of 246 Clifton.

V

In arguing the judge imposed an excessive sentence, defendant argues, among other things, that the judge erroneously relied on his own interpretation

of the evidence in concluding defendant was in a supervisory role over defendant Garcia. To be sure, defendant was not charged or convicted as a supervisor of a network, but in explaining the factual bases for the sentence imposed, the judge stated that the videos showed

> Garcia was the person who was most at risk directly dealing with the public, directly dealing with potential undercover agents and it's [defendant] who is standing in the back, obtaining the proceeds of that illegal activity, and controlling the warehouse of drugs and counting the money.

Consequently, the judge

> [did] not find the aggravating factor of organized criminal activity. However, [he did] find that there was a supervisory role between [defendant] and Mr. Garcia. [Defendant had] a supervisory role which is an aggravating factor in terms of sentencing.

In the overall context, however, the reference to defendant's supervisory role was offered as much as an explanation for why the sentence imposed on defendant was greater than that imposed on co-defendant Garcia.

In any event, the judge's utilization of his view of the evidence is not inconsistent with State v. Melvin, 248 N.J. 321 (2021), because, here, the judge was fashioning an appropriate sentence based on the evidence without acting inconsistently with the jury verdict.

21

We find insufficient merit in defendant's remaining arguments about the sentence imposed to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0681-18