709 A.2d 288

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. RONALD SEXTON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 18, 1997—Decided May 6, 1998.

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Ivelisse Torres,* Public Defender, attorney for appellant (*Ronald J. Gregorio,* Designated Counsel, of counsel and on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Teresa A. Blair,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

Defendant, Ronald Sexton, was fifteen years old on May 10, 1993, when he fired a gun, resulting in the death of his friend Alquadir Matthews. He was charged with murder, unlawful possession of a handgun without a permit, and possession of a weapon for an unlawful purpose. After a hearing lasting several days in March 1995, the Chancery Division, Family Part, waived jurisdiction to the Law Division, pursuant to *N.J.S.A.* 2A:4a–26. A jury convicted defendant of reckless manslaughter, *N.J.S.A.* 2C:11–4(b)(1), as a lesser included offense of murder. The jury also convicted defendant of unlawful possession of a handgun without a permit, *N.J.S.A.* 2C:39–5(b), and acquitted him of possession for an unlawful purpose, *N.J.S.A.* 2C:39–4(a). Defendant received a seven year sentence with a three year period of parole ineligibility on the manslaughter conviction and a concurrent four year term on the possession offense. On this appeal, defendant makes the following arguments:

POINT I THE PROSECUTOR FAILED TO DISCLOSE EXCULPATORY EVIDENCE PURSUANT TO BRADY V. MARYLAND BY FAILING TO PROVIDE THE IDENTITY OF THE OWNER OF THE GUN (NOT RAISED BELOW).

POINT II RONALD SEXTON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY HIS DEFENSE ATTORNEY'S FAILURE TO REQUEST FROM THE PROSECUTOR THE IDENTITY OF THE GUN'S OWNER (NOT RAISED BELOW).

POINT III THE VERDICT FINDING RONALD SEXTON GUILTY OF RECKLESS MANSLAUGHTER IS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT IV THE CHANCERY DIVISION–FAMILY PART ERRONEOUSLY WAIVED JURISDICTION TO THE LAW DIVISION–CRIMINAL PART GIVEN THAT RONALD SEXTON ESTABLISHED THAT (1) HE COULD BE SUCCESSFULLY REHABILITATED BEFORE REACHING AGE NINETEEN AND THAT (2) THE PROBABILITY OF HIS REHABILITATION SUBSTANTIALLY OUTWEIGHED THE REASONS FOR WAIVER.

(A) The Family Court Abused Its Discretion By Basing Its Conclusion That Mr. Sexton Could Not Be Successfully Rehabilitated Before Reaching Age Nineteen On Findings Of Fact Not Grounded In Competent, Reasonably Credible Evidence.

(B) The Family Court Incorrectly Determined That Mr. Sexton's Probability Of Rehabilitation Did Not Substantially Outweigh The Reasons For Waiver Given That The Family Court Relied On Factors Prohibited By New Jersey Case Law.

POINT V THE TRIAL COURT ERRONEOUSLY EXCLUDED TESTIMONY CONCERNING MR. SEXTON'S LIMITED MENTAL ABILITY AND HIS STATUS AS A SPECIAL EDUCATION STUDENT.

POINT VI RONALD SEXTON WAS IMPROPERLY SENTENCED BECAUSE THE SENTENCING COURT DID NOT EXPLAIN HOW IT BALANCED THE AGGRAVATING AND MITIGATING FACTORS.

 We have first considered defendant's argument in Point IV that the Family Part Judge erred in waiving jurisdiction to the Law Division. The judge applied the correct standards under *State v. Scott,* 141 *N.J.* 457, 661 *A.2d* 1288 (1995) and *State v. R.G.D.,* 108 *N.J.* 1, 527 *A.2d* 834 (1987), applying *N.J.S.A.* 2A:4A-26a. *See also State v. Onque,* 290 *N.J.Super.* 578, 676 *A.2d* 560 (App.Div.), *certif. denied,* 146 *N.J.* 497, 683 *A.2d* 200 (1996). While our decision might have been different with respect to the

probability of rehabilitation before age nineteen,[1] there was suffi-
cient credible evidence to support the judge's determination, and
we do not find it to be such a "clear error of judgment [as to]
shock[ ] the judicial conscience." *State v. Scott, supra,* 141 *N.J.* at
467, 661 *A.*2d 1288.

However, after a thorough review of the record and the argu-
ments submitted, as well as the applicable law, we are convinced
that plain error in the jury charge, though not raised by defendant
on appeal, nevertheless requires us to reverse defendant's convic-
tion of reckless manslaughter. Because that error does not affect
the guilty verdict for unlawful possession, we affirm that convic-
tion.

Many of the facts are not in dispute. On the evening of May 10,
1993, Ronald Sexton and Alquadir Matthews, who had been
friends and neighbors for several years on Fairmount Avenue in
Newark, were standing on the sidewalk near a house owned by
defendant's mother. At some point the boys walked to a nearby
vacant lot, where they both handled a handgun. As we will
discuss below, the jury did not hear that the gun was registered to
Matthews' grandmother, with whom he lived. Matthews assured
Sexton that the gun was not loaded. Matthews repeated that
assurance after Sexton asked whether he was "sure." Sexton
pulled the trigger. The gun fired one bullet that hit Matthews.
After the shot, each boy ran off. Matthews ran to his grandmoth-

---

[1] The State argued that defendant had not proved the requisite likelihood of
rehabilitation before age nineteen, citing the report of defendant's expert psy-
chologist that "[defendant] will continue to require ... supervision and structure
[like the small self-contained classroom when he was in school]." The State
argued that the psychologist was unable to "elaborate as to what type of
supervised structure is within the confines of the juvenile correctional system
that would best facilitate Ronald Sexton." It seems to us that the burden of
production (though not the burden of proof) is unfairly placed on the juvenile to
show available means of rehabilitation when information and control over
programs within the juvenile justice system is more accessible to the State than
to the juvenile. However, it is within the province of the other co-equal
branches of state government to establish and maintain facilities within which
rehabilitation of juvenile offenders would be a realistic goal.

er's apartment, where he collapsed. An ambulance soon arrived and took him to the hospital, and he died soon after. Sexton ran to his sister's apartment in the three-family house owned by his mother.

Later that night Sexton left his sister's apartment, returning to rented quarters in Montclair where he and his mother resided and from which he attended school. The next day, Sexton went to stay with his father in Philadelphia. There is contradictory evidence as to precisely when Sexton realized that Matthews had been shot, and when he learned that Matthews had died. In any event, defendant remained in Philadelphia with his father for eight months, long after learning of Matthews' death and after learning that the police were looking for him. Apparently his father advised him not to return to New Jersey. In January 1994, one of Sexton's uncles accompanied him to turn himself in to the police in Philadelphia.

The primary issue for the jury was whether this shooting was the result of a tragic accident, or whether defendant acted recklessly and therefore was guilty of manslaughter. It is with those factual and legal questions in mind that we address defendant's arguments on appeal, for the context is critical to our conclusions. At trial, as on appeal, the defense theory of the case was that at the time of the shooting, Sexton was under a reasonable though mistaken belief that the gun was not loaded. *See Wilson v. Tard,* 593 *F.Supp.* 1091 (D.N.J.1984). In *Wilson,* defendant's conviction of reckless manslaughter was reversed because the jury had not been charged that the State carried the burden of refuting the defense of mistake of fact. Although the State seeks to distinguish *Wilson v. Tard* on the facts, we find those facts to be on all fours with this case.

In *Wilson* the defendant claimed that he aimed the gun at the victim only to frighten him, and that he had first removed the magazine of bullets. He claimed he was unaware that one bullet remained in the chamber when he fired the gun. The victim was killed. Wilson argued that his mistaken but reasonable belief that

the gun was unloaded negated the recklessness necessary for a manslaughter conviction. The District Court Judge, applying New Jersey law, agreed.

Here defendant's argument is even stronger. Sexton testified that Matthews invited him to the empty lot in order to show him "something." The something turned out to be the handgun. According to Sexton, the following exchange ensued:

Q. Now when you were talking to Alquadir Matthews, tell us what he said to you and what you said to him?

A. He told me he wanted to show me something.

Q. Where was he when he said that?

A. We was walking—we was walking towards the lot.

Q. Did he show you anything while you were walking?

A. No.

Q. Where were you when he—did he show you something?

A. Yes. Yes.

Q. Where were you when he showed you something?

A. In the lot.

Q. And what did he show you?

A. A gun.

Q. Did he say anything about that gun?

A. Yes.

Q. What did he say?

A. *He told me the gun was empty.*

Q. *What did you say?*

A. *And I asked him was he sure.*

Q. *What did he say?*

A. *He said yes.*

Q. And at that time where was the gun?

A. In his hand.

Q. What, if anything, happened after he told you that there was no bullets in the gun—the conversation—what happened to the gun?

A. Then he asked me would I like to see it.

Q. And what did you say?

A. I told him yes.

Q. And what happened to the gun then?

A. I took the gun and was looking at it.

[Emphasis added].

Detective Gary Prystauk, a firearms examiner for the Newark Police Department Ballistics Laboratory, testified with respect to the gun that was recovered. According to him, the weapon's sealed chamber design required a person to pull the slide back in order to see whether a bullet was chambered. Detective Prystauk agreed that an inexperienced person easily might assume that once the magazine had been removed, no bullet remained in the chamber. In fact the gun can hold a chambered bullet with or without the magazine in place.

The only other evidence of the conversation between Matthews and Sexton came from Shakirah Jones. Jones was the same age as Sexton and lived in the neighborhood, although she did not really know him. Her testimony was somewhat inconsistent, especially in light of several prior statements she had given and variously recanted. We also note substantial leading by the assistant prosecutor, although without objection.

Jones testified that she was out on Fairmount Avenue with some other girls on the evening of the shooting, and that she saw and heard Ronald Sexton and Alquadir Matthews on the sidewalk arguing about their dogs.[2] She testified as follows:

Q. Right before the shooting took place, did something happen that caught your attention?

A. Just some argument.

Q. Arguing?

A. Yes.

Q. Who was arguing? Who did you notice arguing?

A. Ron and Quadir [Alquadir Matthews].

Q. Ron and Quadir?

A. Yes.

. . . .

Q. Now what could you hear what they were arguing about?

A. Dogs.

---

[2] Defendant and other defense witnesses testified that neither boy owned a dog. The State offered contrary evidence.

Q. Dogs?

A. A dog fight.

Q. And what do you recall hearing them saying to each other, if anything?

A. Quadir was talking about a dog fight. Ron didn't want to hear it. So he told him to leave him alone and stop playing. He didn't want to hear it.

So Quadir kept talking.

Q. What was Quadir saying about the dog fight?

A. I don't remember.

Q. Ron didn't want to hear it?

A. No.

Q. Okay. And what—Quadir kept on talking about it?

A. Yes.

At that point, according to Jones, the boys went into the lot where she claimed to be able to see them. However, she did not see the shooting. She only heard a shot. She then saw Sexton throw the gun, and each of the boys ran off in a different direction. Earlier she had testified that she saw Sexton with the gun as the boys walked into the lot. Her testimony continued as follows:

Q. And then what happened? Did you see him? What did you see, if anything, he do with the gun?

A. I didn't see him—what he did with it.

All—only thing I seen was when they were talking he said—Ron said to Quadir: So you think there are no bullets in this gun.

And Quadir said: There is no bullets in this gun. And then that is when I heard the shot but I didn't see it.

He—and they all ran out of the lot.

Q. You heard Ron say: You think there are no bullets in the gun?

A. Yes.

Q. What did Quadir say?

A. There are no bullets in the gun. Stop playing.

Q. Quadir said: There are no bullets in that gun. Stop playing?

A. Yes.

Q. And then if you didn't see the shooting you just heard the shot?

A. I heard the shot.

Q. How many shots did you hear?

A. One.

According to Jones, after defendant threw away the gun, a third boy kicked the gun under a car, and later led police to the spot where they found the gun.

With the significance of the mistake of fact defense in mind, *see* *N.J.S.A.* 2C:2–4(a)(1), we address defendant's arguments in Points I and II that the omitted evidence of the gun's ownership was material. Defendant claims that the State violated its obligation under *Brady v. Maryland*[3] by failing to provide defendant with the identity of the gun owner, and that Sexton was denied effective assistance of counsel by his trial attorney's failure to request that information from the prosecutor. Neither claim was raised below, and we therefore address both according to the plain error standard. *R.* 2:10–2. The State contends that it had no obligation under *Brady* to determine and provide defendant with the identity of the gun's owner; that defense counsel was on notice, at least as of the date of the waiver hearing, that the gun may have belonged to Matthews' grandmother; that he could have sought confirmation of that information;[4] and that in any case, ownership of the gun was not material to the trial.

Evidence that the gun was registered to Matthews' grandmother, which the jury never heard, would have corroborated Sexton's testimony that Matthews brought the gun to the scene and offered to show it to Sexton; that Sexton actually relied upon Matthews' telling him that the gun was not loaded; and that it was reasonable for Sexton to do so. It was certainly material for the jury to hear corroboration of defendant's testimony. Such evidence could have negated the inference that Sexton knew or should have known the gun was loaded, or even that he was the kind of young person who carried a gun.

The State argues that it would only be material for the jury to know the ownership of the gun if there were also evidence that Sexton himself knew the ownership of the gun. We disagree. It was enough that defendant knew that Matthews brought the gun.

---

[3] 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963).

[4] Defendant has supplemented the record with counsel's affidavit that his post-trial efforts to verify the registered owner of the gun were refused by various governmental authorities.

Lack of materiality is belied by the assistant prosecutor's argument in summation that it was an intentional shooting and that

the defendant, I submit to you, this was his gun. He knew how to use it and he knew how to get it prepared, ready to fire. And he was the one who did that because it flies in the face of common sense that the victim would have handed him something just ready to go off like that. . . .

The State must have known the gun was not stolen, as defendant was never charged with receiving stolen property.

Irrespective of whether this situation constitutes a *Brady* violation, it certainly contributed to depriving defendant of a fair trial. In light of our determination with respect to the jury charge, we need not decide the *Brady* question here, nor whether the omitted evidence alone would require a new trial. It is plain, however, that the information was material, and that the State argued that the gun belonged to the defendant with actual knowledge or reason to know that it did not. That is prosecutorial misconduct.

In addition, defense counsel's failure to pursue the same information and to offer it at trial, under the circumstances of this case, constituted ineffective assistance of counsel with a real potential for producing an unjust result. *See Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987). We see no reason to defer that finding to an application for post conviction relief. *Compare State v. Preciose,* 129 *N.J.* 451, 609 *A.*2d 1280 (1992). Because defendant is entitled to a new trial, we trust the errors of both the State and the defense with respect to the gun's ownership will be corrected.

We now address errors in the jury charge, which compel reversal. First, the trial judge denied defendant's motion for a judgment of acquittal on the murder charge, despite the absence of evidence that defendant intended to kill or seriously injure Matthews. Although the jury acquitted defendant of murder, the unwarranted charge had a potential for leading the jury to a compromise verdict on reckless manslaughter instead of acquitting

him entirely. *See State v. Christener*, 71 *N.J.* 55, 362 *A*.2d 1153 (1976).

> On the record in this case, there was a real possibility that the jury could have found the defendant not guilty. Hence, the possibility that the jury, in the absence of sufficient evidence to sustain a first degree murder charge, may have reached a compromise verdict suggests that Christener may have suffered prejudice by that instruction in spite of his manslaughter conviction.

> . . . .

> Jurors are not skilled in legal techniques. They welcome an opportunity to compose differences and agree upon a compromise verdict. *See State v. Thomas*, 140 *N.J.Super.* 429, 356 *A*.2d 433 (App.Div.1976).

> [*Id.* at 69–70, 73, 362 *A*.2d 1153].

It was therefore error to charge the jury on first degree murder in the absence of any credible evidence that defendant intended or desired Matthews' death or serious injury.

The second critical error was not raised at trial or on this appeal. While we reject defendant's legal argument that the manslaughter verdict was against the weight of the evidence, we are convinced that the reasoning of *Wilson* points to plain error in the jury instructions here. The failure to charge the jury that it was the State's burden to disprove defendant's reasonable belief that the gun was not loaded deprived defendant of a fair opportunity for the jury properly to weigh the evidence of an essential element of the crime: defendant's state of mind at the time of the shooting. We cannot ignore plain error in the jury charge. *See State v. Fair*, 45 *N.J.* 77, 211 *A*.2d 359 (1965) (evidence supported defendant's claim that he acted in the reasonable belief of the necessity to defend another):

> The trial judge has a mandatory duty to charge the jury on the fundamental principles of law which control the case, but whether, in the absence of objection, a failure to so charge constitutes plain error is dependent upon the circumstances of the particular case. *State v. Butler*, 27 *N.J.* 560, 594–595, 143 *A*.2d 530 (1958)....
> Basically, the so-called "affirmative defense" of defense of another in murder cases negates the existence of the essential element of malice.

. . . .

Whether such a mental state existed at all, and if so whether it was reasonably entertained, are necessarily jury questions which cannot be determined by this Court. In any event, this question was so essentially involved in the factual context of this case that the trial court's failure to charge the jury on that issue *sua sponte* was nothing less than plain error requiring a reversal.

[*Id.* at 90, 93, 211 *A.*2d 359].

*N.J.S.A.* 2C:2–4a(1) provides that "mistake as to a matter of fact ... is a defense if the defendant reasonably arrived at the conclusion underlying the mistake and ... [i]t negatives the culpable mental state required to establish the offense...." Where a mistake of fact would negate the mental state that is an element of a crime, the burden of disproving the mistake must fall on the State. *See State v. Kelly,* 97 *N.J.* 178, 200, 478 *A.*2d 364 (1984) (reasonable and honest belief in imminent danger of death essential of self-defense justification for killing).

It is perhaps worth emphasizing here that for defendant to prevail, the jury need not find beyond a reasonable doubt that the defendant's belief was honest and reasonable. Rather, if any evidence raising the issue of self-defense is adduced, either in the State's or the defendant's case, then *the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts;* acquittal is required if there remains a reasonable doubt whether the defendant acted in self-defense. *See State v. Abbott,* 36 *N.J.* 63, 72, 174 *A.*2d 881 (1961). *See generally State v. Chiarello,* 69 *N.J.Super.* 479, 174 *A.*2d 506 (App.Div.1961).

[*Id.* (emphasis added).]

*See also State v. Fair, supra,* 45 *N.J.* at 91, 211 *A.*2d 359 (quoting *State v. Abbott,* 36 *N.J.* 63, 72, 174 *A.*2d 881 (1961)); Cannel, *Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:2–4; comments 2 and 3 on *N.J.S.A.* 2C:1–13 (1997).

■ While we find no decision by a New Jersey court adopting the holding of *Wilson v. Tard,* this case calls for such a ruling before any retrial. The critical holding of *Wilson* is that once the defendant, as here, presents evidence of a reasonable mistake of fact that would refute an essential element of the crime charged, the State's burden of proving each element beyond a reasonable doubt includes disproving the reasonable mistake of fact.

In the case before us, in advancing the argument that he had reasonably believed that the gun was unloaded when he pulled its trigger, petitioner had raised a defense whose proof would negate the mental element necessary to constitute manslaughter. Thus, under *Mullaney* he should have borne only the burden of raising the issue, not that of proving it. The state was required to refute this defense beyond a reasonable doubt as an inseparable part of proving beyond a reasonable doubt that petitioner had acted recklessly and thus was guilty of manslaughter.

[*Wilson v. Tard, supra,* 593 *F.Supp.* at 1096.]

The State's burden with respect to the mistake of fact defense to negate the reckless state of mind for a manslaughter conviction is no less compelling than the burden of disproving a reasonable perception of risk to justify a homicide. The burden is comparable to that required where a defendant presents credible evidence of diminished capacity to negate mens rea. *See Humanik v. Beyer,* 871 *F.*2d 432, 440 (3rd Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1989).

[I]n the situation where the element of the offense and the so-called "affirmative defense" pose the same ultimate issue and a state places the burden of persuasion on the defendant with respect to that ultimate issue.... [T]he relevance of the subsidiary facts in the case are the same and the sole significance of the defendants' evidence concerning the so-called "affirmative defense" is to create a reasonable doubt about the existence of an element of the offense. In this context, as the Supreme Court of New Jersey recognized in both *Breakiron* [5] and *Zola* [6], it is not constitutionally permissible under *Winship* [7] and *Martin* [8] to charge the jury that the defendant has the burden of proving his defense by a preponderance of the evidence.

The same is true where a defendant offers evidence of having acted in the heat of passion, to disprove the purposeful state of mind for a murder conviction. *See Mullaney v. Wilbur,* 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975). *See also State v. Powell,* 84 *N.J.* 305, 315, 419 *A.*2d 406 (1980). As the New Jersey

[5] *State v. Breakiron,* 108 *N.J.* 591, 532 *A.*2d 199 (1987).

[6] *State v. Zola,* 112 *N.J.* 384, 548 *A.*2d 1022 (1988), *cert. denied,* 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989).

[7] *In re Winship,* 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368 (1970).

[8] *Martin v. Ohio,* 480 *U.S.* 228, 107 *S.Ct.* 1098, 94 *L.Ed* 2d 267 (1987).

Supreme Court said in *State v. Bowens*, 108 *N.J.* 622, 632, 532 *A.*2d 215 (1987):

> Our law has always recognized the difference between a defense based on the existence of a fact that negates an essential element of the crime as defined, and the narrower concept of an affirmative defense that excuses conduct that is otherwise unlawful.

▮▮▮▮ Defendant was convicted of reckless manslaughter, albeit as a lesser included offense of murder. Acting "recklessly" is defined by *N.J.S.A.* 2C:2–2b(3):

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Recklessness," "with recklessness" or equivalent terms have the same meaning.

*See also State v. Concepcion*, 111 *N.J.* 373, 384–87, 545 *A.*2d 119 (1988) (Handler, J., concurring). Of course, the judge here did not expressly place the burden of proving the mistake on defendant, as did the judge in *Wilson*. Nevertheless, it is axiomatic that accurate jury instructions in a criminal case are essential to the defendant's constitutional right to a fair trial. *E.g., Concepcion, supra*, 111 *N.J.* at 379, 545 *A.*2d 119. Additionally, we must look to the charge as a whole to determine error and the potential harm therefrom. *Id.* at 376, 545 *A.*2d 119. The judge did explain to the jury that it should acquit defendant of manslaughter if it found defendant to have acted upon a reasonable mistake that the gun was not loaded. The judge also made it clear that the State had to prove each element of the offense beyond a reasonable doubt. However, the judge did not make it clear to the jury that in order to prove the element of recklessness, the State had to prove beyond a reasonable doubt either that defendant did not actually believe the gun to be unloaded, or that his belief was unreasonable. In other words, the jury should have been instructed that the State had the burden of disproving the mistake of fact defense.

The charge on reckless manslaughter followed the charges on murder and aggravated manslaughter. The judge described the alternative theories of the case in the context of the elements of aggravated manslaughter:

> You have to consider the nature and purpose of what Ronald Sexton did, the circumstances known to him and you have to determine whether, in light of those things, his disregarding the risk was a gross deviation from what a reasonable person would have observed in the defendant's situation.

> Now, again the state and the defense have differing version, factual versions of what they contend happened here. The state contends that Ronald Sexton—the first position of the state of course is this was knowing purposeful murder but alternatively the state would contend, if not satisfied with that, at the very least there was an act of recklessness. That Ronald Sexton, pointing a loaded gun at or in the direction of Alquadir Matthews and pulling the trigger amounted to recklessness because he had to be aware of the fact that if a gun is pointed at someone and it is loaded and you pull that trigger, you might kill somebody or hurt somebody really seriously and the state says he was aware of that but yet he disregarded that risk. He did it anyhow.

> . . . .

> The defense, on the other hand, contends not that this didn't happen but it was just a tragic accident. The defense contends that Ronald didn't know the gun was loaded. In fact, says the defense, he had been told specifically by Alquadir that it was not loaded.

> So says the defendant, he wasn't being as careful as he might have been if he thought or had any reason to believe the gun was loaded. And unfortunately, unbeknownst to him, it was loaded. Unfortunately at the moment he happened to pull the trigger, it must have been pointing in a direction that found the body of Alquadir with tragic results but it was an accident.

The judge thereafter addressed the lesser included offense of reckless manslaughter:

> Reckless manslaughter is when one person causes another's death and he does so recklessly. Those are the only 2 elements of reckless manslaughter. "A" causes "B's" death. In other words, "B" would not die, "B" being Alquidir Matthews would not die but for what "A" Ronald Sexton did and "A" acted recklessly as I previously defined that word for you.

> If you find beyond a reasonable doubt that Ronald Sexton recklessly caused Alquadir Matthews' death and are satisfied of both those elements beyond a reasonable doubt, find him guilty of reckless manslaughter. If you have a reasonable doubt in your mind as to one or more of those elements, find him not guilty of reckless manslaughter.

I remind you the defendant contends that the state has not been able to prove any of these degrees of homicide: Knowing or purposeful murder, aggravated manslaughter, being reckless, causing death under circumstances manifesting extreme indifference to human life or even reckless manslaughter, a reckless causing of death.

Defense contends this was a tragic accident. That Alquadir, says the defense, handed the gun to Ronald. Alquadir told Ronald, you know, the gun was not loaded. Ronald believed that the gun was not loaded. Ronald did not think the gun was pointed at Alquadir when it went off. But the gun went off accidentally and, says the defense, that is a very tragic and sad accident but it is not a crime.

If, after considering all the evidence in this case, including the evidence presented by the defense as well as the evidence presented by the state, if you have a reasonable doubt in your mind as to whether the state has proven all the elements of any of these crimes: Murder, aggravated manslaughter, or reckless manslaughter, you must find the defendant not guilty of those crimes. On the other hand, if and only if you're satisfied from the evidence that the state has proven beyond a reasonable doubt all the elements of any of those degrees of homicide, you may find the defendant guilty of that degree of homicide.

We cannot conclude that the jury understood that it was the State's burden to disprove defendant's mistake beyond a reasonable doubt. The prosecutor's misconduct, along with the defense attorney's ineffective assistance, combined to deprive the jury of the opportunity to weigh the gun's ownership along with the other evidence of defendant's state of mind at the time of the shooting. Because the evidence of a reckless shooting rather than an accident was not strong, the failure to explicitly place upon the State the burden of disproving defendant's reasonable mistake of fact cannot be deemed harmless error. As we held in another context in *State v. Parsons,* 270 *N.J.Super.* 213, 224–25, 636 *A.2d* 1077 (App.Div.1994), "[t]he error undermines our confidence that the deliberative process produced a just result and the conviction must be reversed." The erroneous charge alone is sufficient to require a new trial. Even if it were not, the addition of the prosecutorial misconduct and ineffective assistance of counsel that combined to hide the gun's ownership from the jury establish cumulative error requiring a new trial. *See State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.2d* 541 (1954); *State v. Allen,* 308 *N.J.Super.* 421, 431–32, 706 *A.2d* 220 (App.Div.1998).

In Point IV defendant contends that the trial judge erred in barring him and his mother from testifying to his placement in a special education class, his attendance at a special school, or his classification as impaired in any way. Although the jury heard nothing about it, the defendant was apparently a special education student who attended a special school to which he was sent by the Montclair Board of Education. With respect to the exclusion of testimony regarding Sexton's "limited mental ability and his status as a special education student," we add these comments in the event of a retrial.

Defense counsel at this trial clearly stated that he did not intend a diminished capacity defense, and the trial judge accepted the State's arguments that allowing the proffered evidence would open a "back door" into the diminished capacity defense. We are not satisfied that that is necessarily the case, or that such evidence should necessarily be barred despite defendant's intention not to raise a diminished capacity defense. Evidence of defendant's mental ability is potentially relevant to the reasonableness of his perceptions at the time Matthews told him the gun was not loaded. As such, it is therefore relevant to the presence or absence of the requisite reckless state of mind. It is also relevant to the jury's evaluation of defendant's demeanor and credibility as a witness at trial.

We note that despite extensive psychological expert testimony at the waiver hearing, no expert testimony was offered at trial. Under those circumstances, it was within the trial judge's discretion either to admit or to exclude defendant's and his mother's testimony regarding his school placement. The trial judge found the proffer so vague as to be more prejudicial and confusing than relevant. *See N.J.R.E.* 403. However, we think it only fair, in the event of a retrial, that defendant have the opportunity upon proper notice to the State, to offer relevant experts and/or appropriate school personnel, who may be able to fairly describe defendant's mental ability. In light of our decision today, there is no

need to address defendant's contentions regarding the sentence for manslaughter.

We affirm the conviction for unlawful possession of a handgun and the sentence for that offense. We reverse the conviction for reckless manslaughter and remand to the Law Division for further proceedings consistent with this opinion.