750 A.2d 160

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CURTIS CROSS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 13, 2000—Decided May 5, 2000.

Before Judges HAVEY, A.A. RODRÍGUEZ and COLLESTER.

*Justin T. Loughry* argued the cause for appellant (*Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano,* attorneys; *Pasquale Guglietta,* on the brief).

*Robin A. Hamett,* Assistant Prosecutor, argued the cause for respondent (*Lee A. Solomon,* Camden County Prosecutor, attorney; *Ms. Hamett* of counsel and on the brief).

The opinion of the court was delivered by

RODRÍGUEZ, A.A., J.A.D.

In this appeal, we conclude that a conviction for knowingly taking or attempting to exercise unlawful control over a police officer's weapon, contrary to *N.J.S.A.* 2C:12–11, should not be vacated because the judge refused to charge that "mere fleeting or uncertain control" over the weapon by defendant would not be sufficient to support a conviction. We also reject defendant's argument that the court should have charged the affirmative defense of mistake, in addition to self-defense, if defendant mistakenly believed that the circumstances justified disarming the officer.

On July 28, 1996 defendant, Curtis Cross, his girlfriend, Tawanna Little, and their two children were returning to Camden by car from a picnic in Philadelphia's Fairmount Park. Little was driving. At the same time, Delaware River Port Authority Police Corporal

John Leach and Officer Mary Ferguson were working at the Southwest Toll Plaza of the Benjamin Franklin Bridge. Little became annoyed by defendant's "back-seat driving." She pulled the car over and asked Leach to remove defendant from the car.

Leach questioned Little to ascertain if there was a domestic dispute in progress. Leach determined that there was no such dispute. Next, defendant exited the car, approached Leach, and said, "I guess you're just going to believe her side of the story." Leach could smell alcohol on defendant's breath. After a short conversation, defendant agreed not to return to Little's car. He said that he would arrange to stay with a relative who lived a short distance from the bridge. Defendant asked Leach for a ride. Leach refused to give defendant a ride, but directed him to a pedestrian tunnel. Little returned to her vehicle and proceeded to leave the scene.

As defendant began to walk away from the scene, he yelled out, "My keys, my keys." Leach motioned for Little to stop the car. Little was prepared to turn over defendant's keys to him. However, she first wanted to take her house key from the key ring.

There is a sharp dispute as to what happened next. According to Leach, defendant became agitated and started to pace from side to side. Defendant then pushed Leach out of the way in an effort to get to Little and the keys. Leach warned defendant that he would be placed under arrest if he pushed him again. Nonetheless, defendant pushed Leach again. Leach advised defendant that he was under arrest and attempted to handcuff him. A struggle then ensued. Leach grabbed defendant by the throat and defendant had his hands around Leach's head and face. As they struggled, Leach managed to get defendant back to his patrol car. Because defendant continued to resist, Leach tried to contain him by placing him in the corner between the open front door and the patrol car.

Ferguson noticed the struggle in her rearview mirror. She immediately exited her vehicle with her PR24 baton in hand. She approached the two men and saw that Leach had secured defen-

dant's left wrist. As she attempted to place the baton between defendant's arm and body, defendant seized it, "ripped" it out of her hands and threw it. The baton passed approximately six inches away from the left side of her head. Ferguson immediately drew her service revolver. Ferguson ordered defendant to put his hands behind his back. Defendant replied, "Shoot me bitch, shoot me." Eventually, defendant was subdued.

Defendant testified that he never touched Leach until, without provocation, Leach grabbed his throat and was attempting to overpower him. Defendant was trying to retrieve the keys from Little, when Leach "grabbed [him] by [his] wrist and started pushing [him] back." After Leach pushed him in the door of the patrol car, Ferguson's baton made contact with his throat. He felt pain and discomfort and instinctively reached for the object. He pulled the baton away from his throat and threw it away. He denied swinging or throwing the baton at anyone. He never even saw Ferguson approach.

Defendant presented expert testimony to demonstrate that Ferguson's use of the baton was inappropriate. The expert discussed how the baton was a deadly weapon and its use could cause an individual to feel the need to protect himself.

During deliberations, the jury sent out the following written question, "for what reason does defendant need glasses?" After discussing with counsel his proposed answer to that question, the judge told the jury, "[T]he reason for which the defendant wears glasses has not been testified to, and therefore, it's not in this case." Defense counsel objected to this answer arguing that the jury would assume they "can't even consider the fact that [defendant's] glasses were knocked off because it's irrelevant because [they] don't have the information."

Defendant was convicted of fourth degree resisting arrest, *N.J.S.A.* 2C:29–2a; and second degree disarming of Officer Ferguson, *N.J.S.A.* 2C:12–11b. He was acquitted of two related counts of aggravated assault upon Leach and Ferguson. The State moved that defendant be sentenced as a persistent offender

pursuant to *N.J.S.A.* 2C:44–6e, 2C:44–3a and 2C:43–7a(3). The judge granted the motion and imposed an extended twelve-year term on the conviction for disarming a law enforcement officer and a concurrent one-year term on the resisting arrest conviction. Defendant moved for a new trial. This motion was not decided prior to the filing of a notice of appeal.

I

■ Defendant appeals, contending that the jury instruction most material to the disarming charge was deficient because the judge failed properly to define "unlawful control." Further, he argues that the Legislature's decision to use the language "knowingly take[s] . . . unlawful control" instead of "removes from" suggests some higher threshold of action by the actor. That is, something more than "fleeting or uncertain control." Defense counsel proposed the following instruction, which was rejected by the judge:

For a defendant to have taken "control" of a weapon, it must be proven beyond a reasonable doubt that the defendant knows what the object is, is aware of the presence of the weapon and is able to exercise intentional control or dominion over it when he obtains it.

Under our law, this "possession" or control cannot be a merely passing control that is fleeting or uncertain in its nature. If the possession is mere passing control that is fleeting or uncertain in its nature, then the defendant cannot be said to have taken "control" of the item within the meaning of the law, and the charge of knowing taking of unlawful control has not been proven.

We reject defendant's argument that this instruction accurately reflects the elements of the offense.

■ We begin our analysis with a review of the statutory text. *N.J.S.A.* 2C:12–11 provides:

A person who knowingly takes or attempts to exercise unlawful control over a firearm or other weapon in the possession of a law enforcement or corrections officer when that officer is acting in the performance of his duties, and either is in uniform or exhibits evidence of his authority, is guilty of a crime of the second degree.

The statute does not define the terms "takes" or "exercise unlawful control." Obviously, the statute is designed to protect law enforcement officers from being disarmed by an offender. The

offense occurs when there is an interference with the officer's possession or control of the weapon. This interference can result from either a "taking" or "an attempt to exercise unlawful control" by defendant. In the latter case, possession by defendant is not an element of the offense. For example, if a person is able to disarm a police officer by the use of a stick or a pole, the offense occurs without the actor ever gaining possession of the weapon. Such action, by the offender, would be an attempt to exercise unlawful control over the weapon. Therefore, because possession by defendant is not necessarily an element of the offense, it was not error for the judge to refuse to charge that "fleeting or uncertain possession" was insufficient to support a conviction. Under the facts admitted by defendant, his possession of the baton was not an element of the offense. His attempt to exercise unlawful control was sufficient.

With respect to the term "unlawful" the judge gave the following instruction:

A person exercises unlawful control over an item when he does anything to either take possession of the person who has possession of it, without permission or legal authority, or without legal right, or legal excuse or justification. That is, unlawful control means that the defendant acted without legal right, excuse, or justification for having done that which he did, in taking control, or attempting to take control of the weapon.

If the defendant, Mr. Cross, was acting in a reasonable manner to protect himself from the application of unreasonable or deadly force, then his purpose and his control is lawful, not unlawful. Like all elements of an offense, the state must prove the unlawful character of the taking beyond a reasonable doubt.

The defense does not have to prove that his possession or attempted taking was lawful. The defendant testified or presented proof that he acted reasonably in self protection. It is then up to the state to prove beyond a reasonable doubt that this justification or lawful reason did not actually exist, and there was no need for the defendant to protect himself from unreasonable or deadly force.

Unless the state proves that the defendant acted unlawfully beyond a reasonable doubt, then his possession is not unlawful, and you must find him not guilty of this offense. In order to prove the defendant attempted to exercise unlawful control over the PR–24 baton, the state must prove beyond a reasonable doubt that the defendant purposely attempted to exercise unlawful control over the weapon.

We perceive no error in the instruction as given. As defendant's brief concedes, the instruction, read as a whole, conveyed to the jury the principle that if defendant acted in self-defense, his

attempt to exercise control would not be unlawful. This instruction provided the jury with a method to differentiate between a lawful and an unlawful act. Thus, the jury was free to either accept defendant's self-defense theory and find his acts lawful or reject it. Apparently, the jury rejected defendant's self-defense theory.

## II

■ Defendant next argues that the trial judge erred by not instructing the jury on mistake of fact because "the jury should have acquitted [defendant] if they concluded, as suggested by its several not guilty verdicts, that [defendant] actually and reasonably, but mistakenly, believed he needed to protect himself." Defendant concedes that he did not request this charge. He contends that the judge should have explained how, even if the State disproved defendant's claim to justification, he could have been entitled to an acquittal because he mistakenly believed in the need to act in self-defense. Defendant relies on *State v. Sexton*, 311 *N.J.Super.* 70, 82, 709 *A.2d* 288 (App.Div.1998). However, this contention is merely a re-assertion of the self-defense/justification argument raised at trial and reinforced in summation by the comment that defendant's behavior was a "defensive reaction."

■■ *N.J.S.A.* 2C:2–4a, provides that:

[i]gnorance or mistake as to a matter of fact or law is a defense if the defendant reasonably arrived at the conclusion underlying the mistake and:

(1) It negatives the culpable mental state required to establish the offense, or

(2) the law provides that the state of merit established by such ignorance or mistake constitutes a defense.

It is a defendant's responsibility to come forward with "some evidence" in order to support a theory of mistake. *State v. Kelly*, 97 *N.J.* 178, 200, 478 *A.2d* 364 (1984). However, because mistake negates the culpable mental state, once the defense is presented, the State bears the burden of disproving it beyond a reasonable doubt. *Ibid.*

Here, defendant's testimony was not that he took the baton by mistake. His version was that he intentionally took the baton, but that his conduct was justified because he acted in self-defense. He, therefore, did not allege that he was ignorant of a fact. Instead, he reached a conclusion based on the same facts that were presented to the jury, that his conduct was justified. However, the jury was charged on self-defense and it rejected its applicability in this case. We perceive no error, let alone plain error, in the trial court's decision not to charge, *sua sponte*, the affirmative defense of mistake. Although there were facts presented to support a defense of self-defense, there was no basis for the defense of mistake.

Moreover, the *Sexton* case is distinguishable on the facts. In *Sexton*, the defendant, a juvenile tried as an adult, was charged with murder and related weapon charges following the shooting death of his friend, another juvenile. *Sexton, supra,* 311 *N.J.Super.* at 73, 709 *A.2d* 288. The two boys were handling a gun that was registered to the victim's grandmother, a fact that the jury did not learn. *Id.* at 75, 709 *A.2d* 288. The victim had assured Sexton that the gun was not loaded and he then pulled the trigger hitting his friend. *Ibid.* The victim eventually died from the gunshot wound and Sexton was convicted of reckless manslaughter. *Id.* at 73, 709 *A.2d* 288. At trial, Sexton maintained that he was acting under a reasonable, although mistaken, belief that the gun was not loaded. *Id.* at 76–77, 709 *A.2d* 288. Citing the federal decision of *Wilson v. Tard,* 593 *F.Supp.* 1091 (D.N.J.1984), we held that the trial judge committed plain error by failing to charge the jury that the State bore the burden of disproving the defendant's reasonable belief that the gun he had in his possession was not loaded. *Sexton, supra,* 311 *N.J.Super.* at 82, 709 *A.2d* 288. The Supreme Court affirmed. *State v. Sexton,* 160 *N.J.* 93, 733 *A.2d* 1125 (1999). Here, there was no evidence or argument alleging that defendant acted under any mistaken belief. Therefore, the judge did not commit error by failing to charge the jury as to mistake.

## III

Defendant also challenges his sentence. He asserts that although he technically qualifies as a persistent offender, the judge erred in sentencing him as one because the past offenses and the present offense do not come "within shouting distance of the criteria for imposing an extended term." Defendant also contends that the judge did not engage in a proper weighing of the aggravating and mitigating factors. Lastly, he argues that he should have been sentenced as if convicted of a third degree offense. *See N.J.S.A.* 2C:44–1f(2).

This thirty-three year old defendant had a history of two indictable convictions. One thirteen years before the present offense for possession of a gun, and the other one six years before the present offense for possession of a defaced firearm. He received probationary terms on each conviction.

A persistent offender is defined as:

a person who at the time of the commission of the crime is 21 years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least 18 years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within 10 years of the date of the crime for which the defendant is being sentenced.

[*N.J.S.A.* 2C:44–3a]

In *State v. Dunbar*, 108 *N.J.* 80, 87–88, 527 *A.*2d 1346 (1987), the Supreme Court delineated standards applicable to discretionary extended term sentencing. A sentencing judge must first determine if a defendant is eligible for an extended term, then the judge must determine whether to impose an extended sentence. *Ibid.* The Court expressed its opinion that the imposition of extended terms would be "somewhat rare." *Id.* at 89, 527 *A.*2d 1346. The focus of sentencing under the Code of Criminal Justice is on the nature and circumstance of the offense. *Id.* at 91, 527 *A.*2d 1346. However, with respect to the imposition of an extended term, the focus shifts to offender-related characteristics, *i.e.* past history of criminality and susceptibility to rehabilitation. In short, the entire person is evaluated in the context of the

offense committed. *Ibid.; see also State v. Maguire*, 84 *N.J.* 508, 517, 423 *A.*2d 294 (1980). Accordingly, the sentencing judge must consider a defendant's prior record and other offender-related characteristics in light of the statutory aggravating and mitigating factors.

Here, the judge found, and defendant's brief concedes, that defendant is eligible for an extended term. The judge also found that an extended term was necessary to protect the public. In his analysis, the judge found three of the aggravating factors enumerated in *N.J.S.A.* 2C:44–1a(1); (3) the risk that defendant will commit another offense; (6) the extent of defendant's prior criminal record; and (9) the need for general deterrence. The judge found only one mitigating factor: defendant did not contemplate that his conduct would cause or threaten serious harm. *N.J.S.A.* 2C:44–1b(2).

We note that the incident that gave rise to this conviction was a spontaneous dispute between defendant and his girlfriend. Ferguson was not a target. It is clear that the offense was not motivated by a plan to disarm or attack law enforcement officers. This was basically a domestic dispute that escalated when defendant refused to comply with Officer Leach's order. Officer Ferguson was not harmed in any way. The conduct that the Legislature deemed to be a second degree offense is clearly deplorable and should be punished. But, without intending to deprecate the seriousness of this crime, we believe it, on a scale of opprobriousness, not to have weighed in at the highest end. *State v. Jefimowicz*, 230 *N.J.Super.* 42, 53, 552 *A.*2d 638 (App.Div.1989). Thus, we conclude that the aggravating factors identified by the judge are neither so numerous nor so weighty as to justify the imposition of an extended term. Nevertheless, we reject defendant's contention that mitigating factors (3), (4) and (5) should have been applied. Those factors are not supported by the proofs. We therefore, find it both proper and necessary, *see State v. Jarbath*, 114 *N.J.* 394, 410–12, 555 *A.*2d 559 (1989), to modify the sentence to impose a nine-year term.

## IV

The remaining contentions, whether a new trial was required because the verdicts were against the weight of the evidence, and whether the trial judge's response to the juror's question regarding defendant's eyeglasses was improper, are without merit and do not warrant discussion in a written opinion. *R.* 2:11–3(e)(2).

In summary, the conviction is affirmed, but the sentence is modified to impose a nine-year term. The matter is remanded to the Law Division, Camden County, for entry of an appropriate amended judgment.